THE BANK OF MARYLAND, AND MORRIS AND GILL, *Trustees vs.* ANDREW RUFF, *et al.*—*June,* 1836.

By the acts of 1818, ch. 177, and 1824, ch. 199, debtors of banks in the *State*, are authorized to pay their debts in the notes and certificates of deposite, due by such banks, and this, whether the banks are solvent or insolvent.

Does the clause of forfeiture, for refusal to pay specie, contained in the 4th sec. of the act of 1818, ch. 177, apply to banks, found upon full investigation of their concerns and situation to be in a stable condition, *Qr. Semble,* not. And does not the clause apply exclusively to insolvent banks?

The constitutionality of the acts of 1818, ch. 177, and 1824, ch. 199, has been decided affirmatively by the *Supreme Court of the United States.*

The object of the resolutions of the directors of the *Bank of Maryland,* authorizing the debtors of that institution to pay their debts in the notes and certificates of deposite of, and open accounts, due by such bank, was to confer no new privilege upon such debtors, but to extend to them only rights which had been antecedently created, and secured to them by the laws of the *State* and of which, it was not in the power of the directors to deprive them. There could be no fraud therefore in providing for the enjoyment by debtors, a privilege already bestowed on them by the law

Where the charter of a bank requires seven directors to make a quorum, and the President is declared to be entitled to all the powers and privileges of a director, a meeting of the President and six directors constitute a sufficient board for the transaction of business.

A court of Chancery will not condemn or disturb that, when *bona fide* done, which upon appplication, Chancery would have directed to be done; but must regard and treat it, just as if it had been done by the order or authority of that court.

So where a bank in insolvent circumstances, transferred all its effects to E in trust, for the equal benefit of its creditors, and the trust being a very extensive and complicated one, and almost too difficult and important to be managed by any one person, a public meeting of its creditors, was soon after called, where it was determined to unite two other trustees with E , and he, and the Bank, agreed that two other trustees, recommended by such creditors through their committee, should receive transfers of the property from E and the Bank upon the same trusts originally confided to E ; the whole being done *bona fide* and openly, Chancery will not disturb it, nor in the absence of mal-practice on the part of such trustees, require them to give bond for the due execution of the trusts.

APPEAL from the court of *Chancery.*

On the 24th of April, 1835, the appellees claiming to be creditors of the *Bank of Maryland,* filed their bill in the court of Chancery against the appellants, in behalf of themselves and the other creditors : praying that *Morris, Gill* and

*Ellicott*, the trustees appointed for settling the affairs of the Bank, might render an account of the manner in which they had executed their trust; for an injunction to restrain them from receiving of the debtors to the Bank, at the par or nominal value, its notes, certificates of deposite, and other liabilities, and for the appointment of Receivers to take charge of its effects, books of accounts, &c.

The bill alleged that the complainants and those they were authorized to represent, were creditors of the *Bank of Maryland* to the amount of five hundred thousand dollars. That being thus creditors, the Bank on the 23d of March, 1834, suspended its banking operations, and has not since resumed them, and was, and is, largely insolvent, and without the means presently, or ultimately of paying its just and acknowleged debts. That on the said 23d of March, 1834, at a meeting of but six of the directors, a resolution was passed, that a deed of trust should be at once executed by the Bank, of all its effects to *Thomas Ellicott*, in trust for the equal payment of all its liabilities in the first place, and for the distribution of any balance which might remain among the stockholders. That a deed with such provisions was accordingly executed on that day ; which was subsequently, on the 26th of the same month and year, confirmed by another deed with similar provisions. That on the 5th of the following April, at a meeting of the same number of directors, it was resolved that *Morris* and *Gill*, two of the appellants should be associated with *Ellicott* in the trust, and that a deed conformably therewith, was accordingly executed on that day ; and that the trustees under the last mentioned deed, took possession of the property and books of the Bank, and proceeded to the collection of the claims due to it. That among the resolutions adopted at the first meeting of the directors on the 23d of March, was one which gave to the debtors of the Bank the privilege of paying their debts in its notes, certificates of deposite, &c.; and that the trustees under the supposed authority thereof, and in opposition to the rights and interests of the complainants and other

creditors, have from the beginning, and still continue to receive from the said debtors of the Bank, its notes, certificates of deposite and other liabilities, at their full nominal amount, without regard to the time when they may have been obtained, or of the fact of notice of the assignment to the trustees, supposed to have been effected by the deeds of trust. That the trustees by this course have inflicted deep injury upon all the creditors of the Bank, who had a right to insist, that its debts should be collected in current money, and the avails equally and rateably distributed among them. That so far as the resolution giving this privilege to the debtors of the Bank, is to be regarded as a part of the deeds of trust; the same are fraudulent and void, and should be vacated and annulled, as unjust and injurious to the creditors, and in evasion and fraud of the act of Assembly of December session, 1832, ch. 306.

The deeds and resolutions referred to, were exhibited with the bill. And the Chancellor (*Bland*) on the 25th of April, 1835, *ordered an injunction according to the prayer of the bill,* with leave to the defendants to move for its dissolution, at any time after filing their answers, on giving five days notice to the complainants, or their solicitor.

Afterwards, on the 29th of June, 1835, and before the defendants had answered the complainants, upon obtaining leave, filed a supplemental and amended bill, in which the utter and hopeless insolvency of the Bank is reiterated; and the belief confidently expressed, that the entire assets of the Bank in any manner available to its creditors, was not, and would not, under any circumstances, be more than sufficient to pay from thirty to fifty per cent. of the aggregate amount of its debts, and that consequently, the creditors alone could have an interest in the administration of the trust; the eventual provision for stockholders being necessarily *pro forma* and nominal merely. That although no possibility existed of benefit to the stockholders from the assets of the Bank, yet its corporate franchises might be made valuable to the creditors, if placed under their control, by embarking

their individual resources and credit, in the business to which the possession of those franchises would entitle them; but which could not be expected, nor would perhaps be authorized in persons standing in the relation which the trustees occupied towards the institution.    But, that nevertheless this possibly valuable resource is denied to the creditors, in consequence of a very large proportion of the stock, to which the corporate franchises are attached, having been assigned to the Bank, and having passed with its other property to the trustees under the several deeds before referred to.

The supplemental bill further charges, that there are persons who at one time stood in confidential relations to the Bank, who by mismanagement of its funds and affairs, have made themselves personally responsible for heavy pecuniary losses sustained by it, (materially contributing to its failure,) who by a proper and diligent exertion of the evidence and means now in the possession of the trustees, might be legally or equitably subjected to the payment of the same; but that said trustees (or a majority of them) have not yet, nor do they seem disposed to adopt the necessary steps for that purpose, to the great and serious injury of the complainants and the other creditors.    And that whilst with reference to the persons referred to, the trustees have not displayed that zeal and diligence, which the interests of their *cestue que trusts* require; they have with regard to another class of persons, who are supposed to be liable for the calamities which overwhelmed the Bank; pressed prosecutions both civil and criminal against them, in a manner and with an ardour as unjustifiable for its severity, as their conduct to the first mentioned persons is unbecoming for the opposite quality; though the complainants do not charge the trustees, or either of them, with any corrupt or dishonest purpose, or wilful, or advised design to sacrifice the interests of the creditors to favour or partiality.    That a majority of the trustees claiming to administer the trust, according to their own peculiar opinions, have disregarded and overruled the

wishes and opinions of their co-trustee, (*Ellicott*) and of the great mass of the creditors ; and have denied the complainants such access to the books and papers of the Bank as will enable them to decide upon the conduct of said trustees, in reference to the management of its concerns.   That by means of holding a majority of the stock in virtue of the before mentioned deeds, the said trustees (or a majority of them) persevere in electing as directors of the said Bank, persons not acceptable to the great body of the creditors, and indisposed to co-operate in re-establishing it in a manner, which they believe would conduce to their advantage.   That said trustees (or a majority of them) have committed various breaches of trust, for which they are liable personally to their *cestue que trusts* ; and that they are not collectively, or individually in circumstances adequate to their responsibility for the property of the Bank in their hands ; and that having given no security for the faithful performance of their duties, the creditors are on that account, in danger of suffering great and heavy losses.   That under these circumstances, the complainants and the great mass of the creditors applied to the said trustees to surrender the trust, which one of them (*Ellicott*) agreed to do, but the other two, have hitherto evaded a· compliance with said request upon various, frivolous, and unfounded grounds, and thus the persons who alone are interested in the trust, are excluded from all participation in its administration.   That waiving all objections to the manner in which the trust was originally reposed in the said *Ellicott* ; the complainants now in consideration of his willingness to resign, are willing to regard him as the sole trustee, and insist that all the acts of his associates without his express approval are clearly illegal and void.   That the deed of the 5th April, 1834, under which they claim power to interfere in the execution of the trust, purports on its face no title to any sanction, from any persons beneficially interested in the original trust to *Ellicott*, but such as are mentioned under the vague description of various creditors of the Bank, none of whom however the complainants allege, ever did give their

assent to it.    That if the president and directors had power, and could legitimately make any of said deeds, then the title of the corporation was irrevocably divested by the two first, and transferred to *Ellicott*, the trustee, when the last was executed ; and that as the power of *Ellicott* under the deed to him was simply to dispose of the fund, in a regular administration of the trust, he could not alone, or jointly with the corporation, change or new model the trusts confided to him, or the persons of the trustee as originally created, without the assent of the creditors of the Bank, or a majority of them in amount.

This bill like the original bill, concluded with a prayer for an injunction ; the annulling of the deed of trust to *Morris* and *Gill* ; the appointment of other trustees ; the appointment of a Receiver ; and for general relief.

By an order of the same day, the Chancellor ordered, that the application stand for hearing on the 4th of the then ensuing August, upon notice to the defendants, &c.

*Morris* and *Gill* in their answer say, that they neither admit nor deny that the complainants are creditors, and represent creditors of the Bank to the amount they allege, which from the form in which the claims exist, they have no means of knowing of their own knowledge, and the evidences of which the complainants have omitted to exhibit.

They admit that the Bank on the 23d day of March, 1834, being then in insolvent circumstances, and unable either presently, or ultimately to pay its debts, suspended banking operations ; and they say, that on that day, at a meeting of seven of the directors, it was resolved that a deed of trust should be executed of the property and funds of the Bank and that accordingly, and in pursuance thereof, the first deed to their co-trustee *Thomas Ellicott* was executed, and sealed with the corporate seal of the Bank, and signed by the President, who is by the charter, himself a director, thus giving to the conveyance the sanction of eight directors, and that said con-

veyance was accepted by said *Ellicott*, with the knowledge and approbation of creditors to a large amount. They admit, that the deed of the 26th of the same month, was executed to confirm the preceding one; and charge, that the subsequent deed to them, from the Bank and *Ellicott*, was the result of the recommendation of a large meeting of creditors, at which some of the present complainants were present, and in whose proceedings they actively participated, and fully concurred. They deny, that the said deed of the 5th of April, 1834, to them was made by the *Bank of Maryland* of its own motion, and without solicitation from its creditors. On the contrary, they maintain that the execution of it proceeded from their urgent recommendation; and was decided on, and directed to be executed at a meeting of seven, and not six of the directors, as is alleged in the bill. They admit, that after the execution of the last mentioned deed, they and their co-trustee, accepted and entered upon the duties of the trust; in the administration of which, they considered it their duty to receive in payment of debts due the Bank, its notes, certificates of deposit, and claims against it, at their par, or nominal value; without reference to the time of their acquisition, by those who offered them in payment; and that in pursuance of such, their supposed duty, and in conformity with the opinion of the legal advisers of the trust, they continued so to receive them, until the 5th of June, 1834, when upon the application of a large creditor of the Bank, to the *Baltimore* county court for an injunction, they agreed to, and did suspend their proceedings in this respect, until the opinion of the highest appellate tribunal of the State, could be obtained of its legality. That accordingly the question was submitted to the judges of the Court of Appeals, during the *June* term of that court, when those judges decided, that the conduct of the trustees in this particular, was according to the law, and consequently, that no injunction to restrain them could issue. They further say, that at the same time, when the judges of the Court of Appeals pronounced this opinion; they also decided, that the several deeds of trust, mentioned

in the bill, were valid and binding instruments for the purposes, and objects mentioned in them; and they further charge, that a similar decision was made by the Court of Appeals, at a subsequent term, in a proceeding by the *State of Maryland* as a creditor, against them as trustees. They deny that their course in the administration of the trust, has been unjust, injurious, or oppressive to the creditors; and confidently affirm, that their earnest endeavour has been to fulfil faithfully their duty, and to conform in all respects, strictly to the law.

The answer further alleges, that the continuance of the former injunction, or the appointment of a Receiver would be attended with consequences of serious embarrassment and loss to the creditors of the Bank, by impeding the collection of debts now in progress of liquidation,—retarding the prosecution of suits now depending, or in contemplation; and jeoparding the safety of claims, which may be lost by delay; and all this, without the slightest corresponding advantage to any one interested.

In answer to the supplemental bill, they say, that the dividend which will ultimately be made, among the creditors of the Bank, depending essentially upon the result of suits instituted by them for the recovery of its assets, cannot at this time be stated with any degree of certainty. They cannot say, whether the creditors alone are interested, in the execution of the trust, though looking to the present posture of its affairs, they are persuaded, that the interest of the stockholders is merely nominal. They admit that prior to the suspension of payment by the Bank, eight hundred shares of its stock, were transferred to it as security, by persons who had taken its money, to the amount of four hundred thousand dollars; that by the deed of trust this stock became vested in them, and in virtue thereof, they have caused the same to be transferred to their names, and are thus enabled, and do in fact control the election of directors, and shall continue to do so, until certain suits which they have caused to be instituted against the persons who appropriated the money of the Bank

to themselves, upon its pledge shall have terminated.     They deny however, that they have the sole management of the corporate franchises of the Bank, or that they have attempted or ever contemplated, the exercise of any improper or sinister influence over the directors; or that prior to the last election, which took place on the 7th of March, 1835, the complainants, made any application to them, on the subject of directors.

They insist, that with regard to this stock, as also in their endeavours to find out who are really indebted to the Bank, and successfully prosecute the claims which may be due it; they have been actuated by an honest desire, faithfully to discharge their duty—favouring no one class, at the expense of any other; but diligently, impartially, and earnestly exerting all the means and facilities in their power, to administer the trust, with the utmost possible benefit to all interested in it, notwithstanding the various undefined inferences, and vague insinuations to the contrary, with which the supplemental bill is filled.

The answer further says, that so far from evincing a contumacious disregard of proper inquiries on the part of the complainants, they have promptly, and to the best of their ability, furnished them with all the information they ever desired.     That the assets of the Bank, as converted into cash, have been deposited in the banks of *Baltimore*, or in other safe hands, and having never appropriated one cent to their payment, or in any manner to their own use; they consider themselves individually and collectively, quite able to meet the responsibilities incurred by the trust, as much so, as are the complainants to answer their own engagements. They deny that they claim solely by the appointment of their co-trustee *Ellicott*, or that they have excluded him from all participation in the management of the trust; on the contrary, they have given to his opinions and propositions all the respect which they seemed to deserve, co-operating with him, when they considered him right, and differing from, and overruling him only, when they thought him wrong.     They

deny that the complainants proposed to release them from responsibility, if they would resign their trust, but in the genuine spirit of usurpation, they demanded that the respondents should surrender the evidences of their conduct to unknown, and irresponsible successors, without even exhibiting to the respondents any authority from a majority of creditors, requiring their resignation ; which they are advised and believed would subject them to the danger of great loss, and which they are under no obligation to comply with.

The defendant, *Ellicott*, answered separately, and after admitting the truth of many of the statements in the bills, he professed his willingness that the trust should be remodelled, or placed in other hands ; at the same time, insisting on the perfect fairness of his own conduct, and claiming to be compensated for the trouble and services which he had performed.

*Bland*, Chancellor, on the 23d of May, 1836, after considering the written arguments of the solicitors of the parties, ordered that the injunction granted by the order of the 25th of April, 1835, be continued until final hearing, or further order ; and that an injunction be issued, and Receivers be appointed in conformity with the application and order of the 29th June, 1835.

The operation of this last order was subsequently suspended upon the petition of the defendants, *Morris* and *Gill*, and the questions being again submitted to the Chancellor, upon the notes of their solicitor, his honour on the 8th of June, 1836, re-affirmed the said order, and directed its execution according to the terms thereof.

Appeals were then prayed by the defendants, *Morris* and *Gill*, and the *Bank of Maryland*, from the several orders of the 25th of April, 1835, and the 23d of May, and 8th of June, 1836.

The cause was argued before BUCHANAN, Ch. J. and STEPHEN, ARCHER, and CHAMBERS, Judges.

ALEXANDER, for the appellants, contended.

1. That the injunction granted upon the first bill should be dissolved, because prior to the deeds of trust the debtors to the Bank were authorized by the provisions of the acts of 1818, ch. 177, and 1824, ch. 199, to pay their debts in the notes, &c. of the Bank, at their par value, and that such privilege was not extinguished by the operation of those deeds. On the contrary, the privilege is expressly affirmed by the resolutions of the board, authorizing the making of the deeds, which resolutions under the circumstances are to have the same effect, as if their terms were incorporated in the deeds. *Union Bank of Tennessee vs. Ellicott, Morris and Gill,* 6 *Gill and Johns.* 363. *The State vs. Bank of Maryland, Ib.* 205.

2. All fraud in the execution of the conveyances being denied by the answer to the original bill, no legal intendment can be resorted to, for the purpose of imputing fraud to them, on the ground of their affirming rights secured by the existing laws to the debtors of the Bank.

3. That the president of the Bank, is a constituent member of the board of directors within the meaning of the act of incorporation of 1790, ch. 5. sec. 7, and consequently, the resolutions of March and April, 1834, were passed by competent authority, but that at all events, neither they or the conveyances, can be impeached on that ground by creditors, so long as the stockholders acquiesced in them.

Upon the supplemental bill he insisted, that all its equity was sworn away by the answer, leaving nothing for the orders founded on that bill to rest upon, but the allegation of differences of opinion between the trustees and the creditors, in reference to the mode of administering the trust, and the averment, that the latter distrusted the motives and capacity of the trustees, allegations and grounds altogether insufficient to justify such orders.

4. That the alleged inadequacy of the trustees' private estates, to answer for any possible breach of trust, furnishes no grounds for their removal, no material change in their

circumstances is charged to have taken place since their appointment; and if it was not then an objection to reposing the trust in them, it cannot now be good cause for their dismissal. *Ex parte McWilliams vs. Graham*, 1 *Mad. Rep.* 86. 1 *Wms. Ex'rs*, 120. *Hathornwaite vs. Russel*, 2 *Atk. Rep.* 126. *Anonymous*, 12 *Ves.* 4.

No counsel argued for the appellees.

BUCHANAN, Ch. Judge, delivered the opinion of the court.

*The Bank of Maryland* has proved a fruitful source of litigation, which for the good of all concerned cannot be too soon put an end to.

The several deeds of trust mentioned in these proceedings are now for the third, and the claim of the debtors of the Bank, to pay and discharge their debts to the Bank in the notes and certificates of deposite issued by said Bank, at their par, or nominal value, or amount, the second time brought before us.

In the case of the *Union Bank of Tennessee vs.* these same trustees, *Ellicott, Morris and Gill*, 6 *Gill and Johns.* 363, the application was for an injunction, to prohibit the trustees from receiving the notes and certificates of deposite of the *Bank of Maryland*, in payment of debts due to that Bank. And the then sitting members of this court, being unanimously of opinion that the deed of trust of the 5th of April, 1834, was a valid and effectual deed, for the purposes therein expressed; and that the trustees, *Ellicott, Morris and Gill*, were not only authorized but bound, by the provisions of the acts of 1818, ch. 177, and 1824, ch. 199, to receive the notes and certificates of deposite issued by the Bank, in payment of debts due to the Bank, at their par, or nominal amount or value, whether obtained before or after the execution of the deed, by the debtor or debtors of the Bank, offering them in payment, an order directing an injunction to be awarded was refused.

In the case of the *State of Maryland vs. The Bank of Maryland* and these trustees, *Ellicott, Morris and Gill*, 6

*Gill and Johns.* 205, in which the *State* claimed to be paid fifty odd thousand dollars, due from the Bank on deposite, out of the funds in the hands of the trustees, in preference to the other creditors, it was held by this court for the reasons there assigned, that the deed of trust of the 5th of April, 1834, was valid and effectual to transfer all the property of the Bank to the trustees, and that the preference which the *State* had in the payment of its claim, so long as the title to the property remained in the Bank, was defeated by the deed of trust. And it was only on the ground that the deed of trust was good and valid, to pass the title of the Bank to the property covered by it to the trustees, that the preference claimed by the *State* was lost.

The *State's* right of priority in the disposition of the funds sought to be affected in the hands of the trustees, depended upon the question, whether the title of the Bank had been transferred and vested in the trustees for the general and equal benefit of the creditors, before the assertion of the right or attempt to enforce it by the *State*. And but for the operation of that deed, (being anterior in date to the institution of proceedings by the *State*,) which was ruled to be valid and effectual to vest the title in the trustees, the claim of the *State* to be preferred to other creditors would have prevailed, and upwards of $50,000 been withdrawn from an equal distribution among the general creditors. And now, the validity of that very deed and the right of the debtors to the *Bank of Maryland*, to pay their debts to the Bank, in the notes and certificates of deposite, issued by that institution, at their par or nominal value, and the authority of the trustees so to receive them, are again called in question by a portion of the creditors of the Bank.

In this case the insolvency of the *Bank of Maryland* is expressly charged, and the complainants seek to have the deeds of trust annulled, the appointment of Receivers, and an injunction prohibiting the trustees from receiving in payment of debts due to the Bank, any notes of, or certificates of deposite by, or other claim, &c. against the Bank.

In the case of the *State vs. The Bank of Maryland,* and these trustees, the Bank was also charged and admitted to be insolvent ; and in the case of the *Union Bank of Tennessee vs. these trustees,* although the insolvency of the Bank, is not expressly charged in terms ; yet it is alleged in the bill, and not denied that there would be a large deficiency of assets of the Bank; and the Bank was considered and treated, both by counsel on both sides in argument, and by the judges of this court, as an institution in insolvent circumstances ; and so expressed to be in the two first deeds, which are recited in that of the 5th of April, 1834, under which these trustees have acted.

It was in that view of the condition of the Bank, that the decision was made in each of those cases, and no reason is now perceived for departing from the opinion expressed in either. The resolutions of the 23d of March, 1834, and of the 5th of April, 1834, passed at special meetings of the directors, professing to give to the debtors of the institution the privilege to pay their debts in notes of the Bank, or in certificates of deposite or open account due by the Bank, were then, and are now considered of no importance ; the same right and privilege being held to be given and secured to the debtors by the acts of 1818, ch. 177, and 1824, ch. 199, which right and privilege so conferred, we think it was not in the power of the Bank to deprive them of, and that they were not extinguished or lost to them, by operation of the deeds or either of them, though they should be considered as standing alone, independent of, and not controlled by those resolutions, but remained and still remain unimpaired.

With respect to the question, whether the acts of 1818, ch. 177, and 1824, ch. 199, giving to the debtors of banks the privilege to pay their debts in the notes and certificates of deposite of such banks, relate to solvent banks or to such as are insolvent, or not in a condition to meet their engagements ; it seems to us, taking the two acts and their different provisions together, that if the legislature had in view one condition of a bank more than another, they looked to

banks in insolvent circumstances, or to banks not in a condition to meet their engagements.

The first section of the act of 1818, ch. 177, gives to "any person having a claim, or holding a note of any bank in this *State*, under fifty dollars, after demand of payment of such claim or note at the Bank, and refusal or neglect to pay, the right to recover judgment for the same before a single justice of the peace." The 4th section authorizes "any county court in the *State* on application, supported by affidavit, that a Bank located in the county refuses to pay specie for its notes, &c. to issue a *scire facias* directed to such Bank, to show cause why its charter shall not be declared forfeited by the judgment of the court." The 5th section authorizes the court, "after a full investigation of the concerns and situation of such bank, if in their judgment and opinion, the public interest shall require it, to declare and adjudge the charter of the bank to be forfeited."

The 6th section directs, "that the court declaring, and adjudging the forfeiture of the charter of any bank, (if in their opinion, the interest of the creditors shall require it,) shall appoint three commissioners to settle and close the *concerns* of the bank." And the 13th section provides, "that in payment of any debt due to, or judgment obtained by a bank or banks, in this state, or by the commissioners which may be appointed under the provisions of this act, the note or notes of the bank, to which the debt is due, or by, or for which the judgment has been obtained, shall be received at the full value contained in the promise made by such note or notes."

The 1st section of the act of 1824, ch. 199, provides, "that any certificate or certificates of deposite issued by, and with the authority of any banking institution in this state, shall be, and is hereby declared to be a good and sufficient tender in law, and set off by, and on the part of the holder of said certificate or certificates, for the full value thereof, against the bank or banks, which shall have caused the said certificate or certificates to have been issued :"—and the 2*d*

section declares, " that each and every of the said institutions shall be, and they are hereby required to receive the respective certificates of money deposited in their respective banks, in payment of debts due to the said banks, &c."

Now it seems difficult to suppose, that the Legislature in authorizing and requiring of the courts, to adjudge the charters of banks to be forfeited, *if after a full investigation of their concerns and situation, in their judgment and opinion, the public interest shall require it ;* and in making it the duty of the court adjudging the forfeiture of the charter of any bank, *if in their opinion the interest of the creditors shall require it, to appoint commissioners to settle and close the concerns of such bank,* as they have done by the 5th and 6th sections of the act of 1818, ch. 177, intended that those provisions should only be applied to banks, found upon a full investigation of their affairs to be solvent, and capable of managing their own concerns, and the forfeiture of whose charters could seldom be required, either by the public interest, or the interests of their creditors, and not to insolvent banks, or banks found upon a full investigation of their concerns and situation, to be unable to meet their engagements, and incapable of managing their affairs, and the forfeiture of whose charters may be required, both, by the public interest, and that of their creditors.

It is no ground for adjudging the charter of a bank to be forfeited, that it is in a flourishing and stable condition, either as regards the interests of the public, or of its creditors. And the circumstance that the court is required, before adjudging the charter of a bank to be forfeited, to be satisfied from a full investigation of its concerns and situation, that the public interests demand it, and on so adjudging, to appoint commissioners to settle and close its concerns, shows that those provisions are applicable at least, if not exclusively so, to insolvent banks ; unless it can be supposed, that the Legislature intended to put down banks, that should on investigation be found to be solvent, and useful, and to protect, and continue in operation such as should prove to be insolvent.

A supposition that we do not feel ourselves authorized to indulge in. And the 13th section authorizing the payment of a debt due to *a bank*, in the notes of such bank, also authorizes similar payments in discharge of judgments obtained by commissioners appointed to settle and close the concerns of banks, whose charters may be adjudged to be forfeited; which shows the intention of the legislature to have been to extend the privilege to the debtors of insolvent banks, and not to confine it to the debtors of solvent institutions alone.

But it is believed that the legislature intended to confine it to the debtors and notes of neither description of banks, but to extend the privilege to the debtors of all banks, whether solvent or insolvent. The language of the 13th section, " that in payment of any debt due to, or judgment obtained by a *bank or banks* in *this State* (that is, any bank or banks, &c.) the note or notes of the bank to which the debt is due, or by which judgment is obtained, shall be received, &c." is too broad and comprehensive to admit of any other construction. To confine it to the case of a solvent bank, would, it is conceived, be to pervert the obvious meaning of the terms used, and to defeat the intention of the legislature, which was to extend a benefit to those who may be indebted to banking institutions, and particularly insolvent banks. For if confined to the case of a solvent bank, the privilege would seldom be enjoyed; as a debtor to avail himself of it, would have the difficult task imposed upon him of showing the solvent condition of the institution. And when established, if he could succeed in doing it, the privilege of paying his debt in the notes of such a bank, more than of any other, would be of but little value to him. Whereas it may often be a very great relief and benefit to a debtor, of an insolvent bank, to have the privilege of paying his debt in the notes of that bank. And by gratifying the terms of the law, in applying it to the case of all banks, whether solvent or insolvent, that privilege and benefit will be secured to him without inquiry into the condition of the bank.

The same observations will apply with equal and greater force, to the act of 1824, ch. 199, the title of which is, " an act relating to the banks of this *State*." That is, *all* the banks of the *State*. And the words of the 1st section, " *any* certificate or certificates of deposite, issued by *any* banking institution in this *State*, &c." and on the 2nd section, that *each* and *every* of the said institutions, shall be, and they are hereby required to receive the respective certificates of money deposited in their respective banks, in payment of debts due to the said banks," are too explicit to admit of argument. " Any certificate of deposite, issued by *any* banking institution in this *State*," and " *each* and *every* of the *said institutions*," must embrace every bank in the *State*, solvent or insolvent, and the certificates of deposite issued by any of them. Besides, of what benefit would it be to debtors if confined to the case of a solvent bank? For who doubts, that independent of the act of assembly, any debtor to a solvent bank may set off against the debt, the certificates of deposite of such bank? If any doubt should be entertained as to the constitutionality of these laws, it is enough to say, that, that question has been decided affirmatively by the *Supreme Court of the United States*.

The charge in the bill, " that the several deeds of trust and resolutions (under which the deeds were made) were executed and passed fraudulently, and against the rights of the complainants and the other creditors of the bank," is we think, in nowise sustained. The object of the resolutions was to confer no new privilege upon debtors ; but to extend to them only rights, which had antecedently been created and secured to them by the laws of the *State*, and of which it was not in the power of the bank to withhold or deprive them. There could therefore be no fraud or prejudice to creditors, in admitting or providing for the enjoyment by debtors of a privilege already bestowed upon them by law. And we perceive as little objection to the deeds which we hold to be good and valid. Indeed it is not understood that they are called in question, except so far only, as the resolu-

tions in favour of debtors may be deemed and taken to be a part of them, or as regulating the administration of the trust. With respect to the resolution of the 5th of April, 1834, under the authority of which, the deed of trust to these trustees was executed, it appears that it was passed at a meeting of seven directors of the bank including the president; and the president being by the charter, declared to be, " entitled to all the powers and privileges of a director, we think that the provision of the charter requiring seven directors to make a board was gratified by a meeting of the president and six others; and that so assembled they constituted a sufficient board for the transaction of the business of the bank.

As to the deed of trust to these trustees, it was made under circumstances of a peculiar and imposing character; and it is sufficient to remark in addition to what has been heretofore said and done, in relation to the same subject, that subsequent to the appointment of *Thomas Ellicott*, as a sole trustee, (being a very extensive and complicated trust, and almost too difficult and important to be confided to, or managed by any one person) there was a large meeting of the creditors of the *Bank of Maryland*, including some of these complainants, and presidents, and cashiers of other creditor banks in *Baltimore*, convened in pursuance of public notice ; at which a committee of creditors was appointed for the purpose of promoting the general interest of the creditors, of which one of these complainants was a member and acted as such.    That committee determined that there ought to be other trustees associated with *Thomas Ellicott*, and appointed a sub-committee, (two of whom represented two of the creditor banks) to confer with the then sole trustee, *Thomas Ellicott*, on the subject, who agreed that the committee of creditors should nominate one co-trustee, and that another should be nominated by Judges *Archer* and *Dorsey*.    The committee nominated *John B. Morris*, and the judges named *Richard W. Gill*, which nomination being approved by the committee, the resolution of the 5th of April, 1834, and the deed of trust of that date to *Thomas Ellicott*, and *John B. Morris*, and

*Richard W. Gill,* as adjunct trustees was passed and executed. So that it appears that *Morris* and *Gill* were nominated to, and appointed by the bank as associate trustees, after notice to and consultation with a large body of the creditors, and with their consent and approbation, and the consent of *Thomas Ellicott,* and with a view to the proper administration of the affairs of the bank. There does not appear to have been any fraud, surprise, secrecy or improper contrivance, in the procurement of this deed; nor any design to injure the creditors or any of them. On the contrary, the whole proceeding seems to have been fair, open, and in good faith, and to have had for its object, the interest and equal benefit of all the creditors.

If the same creditors, (the trust being of such great magnitude and involving many, and extensive interests) instead of proceeding as they did, to procure a deed of trust to be executed by the bank, appointing associate trustees with *Thomas Ellicott,* had applied to the court of Chancery, with the knowledge and consent of *Ellicott,* and of the bank, to effect their object, it is not doubted that the Chancellor would have decreed the same thing to be done. And sitting as a court of Chancery, and acting upon an acknowledged principle of that court, we cannot condemn or disturb that, when *bona fide* done, which upon application, Chancery would have directed to be done; but must regard and treat it just as if it had been done by the order or authority of that court.

Looking to this case, as it is presented to us upon the bills, answers and exhibits, we can perceive no fraud or malpractice on the part of these trustees; nor any improper negligence or partiality in the execution of their trust, or other violation of the duties imposed upon, or confidence reposed in them, to entitle the complainants to the injunction prayed, or to require or authorize the appointment of receivers.

Having received their appointment at the instance of a large number of creditors, whose confidence they enjoyed without being required to give bond, for the faithful discharge

of their trust, and having done nothing to forfeit that confidence, they too being creditors of the *Bank of Maryland*, and *Morris*, at the time also the president of a˙ creditor bank; and no unfavourable change in their condition or circumstances, appearing to have taken place since their appointment, nor cause to apprehend any, their not having given bond furnishes no ground for the interposition of Chancery.

If they have done wrong in receiving in payment of debts due to the bank, the notes and certificates of deposite issued by that institution, they were misled by the decision in the case of the *Union Bank of Tennessee*, and the error was ours; but we have seen nothing to render us dissatisfied with that decision.

ORDERS REVERSED AND INJUNCTIONS DISSOLVED.