JOHN J. GHINGHER, Receiver, *v.* CRAVEN P. PEARSON et al.

MAYOR AND CITY COUNCIL OF BALTIMORE *v.* CRAVEN P. PEARSON et al.

CRAVEN P. PEARSON et al. *v.* JOHN J. GHIN-GHER, Bank Commissioner.

[Nos. 14, 15, 16, October Term (Advanced).]

274

*Nos. 14 and 15 decided July 7th, 1933.*
*No. 16 decided, after reargument, July 31st, 1933.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Herbert Levy,* with whom was *A. Cecil Snyder* on the brief, for John J. Ghingher, Receiver.

*R. E. Lee Marshall, City Solicitor,* with whom was *Allen A. Davis, Assistant City Solicitor,* on the brief, for the Mayor and City Council.

*Charles G. Page, Eldridge Hood Young* and *L. Wethered Barroll,* with whom were *John Holt Richardson* and *Paul M. Higinbothom* on the brief, for Craven P. Pearson and Horace E. Wennagle.

*Willis R. Jones, Deputy Attorney General,* with whom was *Wm. Preston Lane, Jr., Attorney General,* on the brief, for John J. Ghingher, Bank Commissioner.

*G. Ridgely Sappington,* for the Baltimore Trust Company.

BOND, C. J., delivered the opinion of the Court.

To meet the exigencies of the banking crisis early in the year 1933, the Governor of Maryland declared successive banking holidays, extending together from February 25th to March 4th, and on March 4th the General Assembly of the State passed an emergency statute, generally referred to as the Emergency Banking Act, to place the business of banking institutions under control, providing for restric-

tions upon withdrawals from deposits where made necessary by conditions of the respective depositaries, and providing a plan for rehabilitation of any institutions which could not be expected to meet their obligations otherwise. Specified deposits of public money were exempted by the statute from the restrictions imposed on withdrawals, and the present litigation has arisen upon complaints of existing general depositors whose rights were thus to be deferred.

The statute, chapter 46 of the Acts of 1933, has added seventeen new sections to article 11 of the Code concerning "Banks and Trust Companies," to follow after section 71. "Whereas," reads its preamble, "An emergency has arisen which has been accompanied by widespread unemployment, decreased values, untimely withdrawals of deposits and other conditions beyond the control of the State, and Whereas, The welfare of the State as a whole and of the depositors and creditors of banking institutions requires the immediate enactment of additional legislation to promote justice, prevent distress and discriminations, and establish an orderly method of reconstruction," therefore the statute is enacted. And concluding sections declare that it is enacted to meet an emergency through the police power of the state, and is immediately necessary for the preservation of the public peace, health and safety. The existence of the crisis so to be met, and its character, the culmination of prolonged economic depression, widespread unemployment and want, prostration of private charity and reduction in supplies of public funds, and the menace to the finances of the people of the state, and of the whole country, from loss of values in banking assets, difficulty in converting them into money, and runs of depositors that had begun, are well known, and in need of no further statements here. The statutory plan has been to place control of the institutions in the bank commissioner so far as conditions may require; those institutions which could not meet all demands at once either to be returned to full freedom after a period of restriction to installment or percentage withdrawals, or to be reorganized if

reorganization should be required to meet the conditions—all as the commissioner might determine after ascertainment of the facts. The control of the commissioner for these purposes is to endure for one year, with possible continuation during another year.

A section 71B provides that all remedies of depositors, creditors, stockholders or others, arising out of agreements or transactions made prior to the passage of the statute, against any institution in the custody of the commissioner, shall be suspended during the period of control, saving, however, rights in or against collateral security. By the same section it is provided that during that period the assets and business of controlled institutions shall be deemed to be in the possession of the commissioner *in custodia legis,* and the property of the institutions shall not be subject to attachment, execution, or seizure under judicial process of any kind. Section 71E provides that any institution in the commissioner's custody may receive new deposits, which shall be subject to withdrawal in accordance with their terms, and shall be preferred, in right of payment and satisfaction, to deposits, debts, or liabilities made or incurred prior to the assumption of management by the commissioner; and percentages of old deposits made available from time to time shall have the status of new deposits within the meaning of the section, and shall not be subject to restrictions imposed on other deposits.

In section 71G, the deposits to be excepted from the imposition of restrictions, and so to be preferred, are specified; and this section is therefore the immediate ground of controversy in most of the suits before the court. It provides that: "All deposits of public money not secured by the deposit of collateral or by a surety bond, guaranteeing the payment of such deposits when demanded, now in any banking institution, made by the State of Maryland, any county, municipality or town, taxing district, or any political sub-division of the State or of any officer, board, commission, institution or other agency thereof or the receiver of any banking institution, shall be entitled to priority and immediately

transferred to a new deposit and thereafter subject to all rights as to new deposits set out in Section 71E of this Act. No restriction or limitation on withdrawals of deposits made by or under the provisions of this Act shall apply to withdrawals from any banking institution by check payable to and in the possession of the City Collector of Baltimore City before five P. M. on February 28th, 1933, and presented by the said collector for deposit to any banking institution in Baltimore City on March 1st, 1933, the aggregate amount of said checks not to exceed $2,101,347.90. Any banking institution is authorized to accept the certification of the City Collector to the facts above stated, and upon such identification the banking institution upon which said checks are drawn is required to pay the same. The purpose of this is to provide the city with necessary funds to meet certain bonded indebtedness and interest which matured on March 1st, 1933, and to enable said city to meet emergency relief for which funds are otherwise unavailable."

The first case was instituted by Craven P. Pearson and Horace E. Wennagle, two depositors in the Baltimore Trust Company, which was one of the banking institutions not permitted to open for the full resumption of its business, and one whose depositors generally were by the terms of the statute deferred to those specified as excepted from restrictions. The original defendants were the bank commissioner and the Baltimore Trust Company, but, upon petitions of several others interested in the question of validity of the priorities, these were admitted as parties defendant; that is, John J. Ghingher, the bank commissioner, in his capacities as receiver of the Title Guarantee & Trust Company, receiver of the Commercial Savings Bank of Baltimore, receiver of the Park Bank, and receiver of the Chesapeake Bank of Baltimore, and the Mayor and City Council of Baltimore. The bank commissioner filed answers and demurrers in his several capacities, and on behalf of the city a demurrer only was filed. The questions at issue were by agreement of all counsel argued on the demurrers. From the decree, so far as it affects priorities in which those parties are interested, appeals have been en-

tered by the bank commissioner as receiver of the Chesapeake Bank, and by the Mayor and City Council of Baltimore, and by the complainants themselves from the upholding by the decree of the statutory exemption or priority of state deposits. In the bill it was averred that the complainants were depositors in the Baltimore Trust Company as stated; that the assets of that company had become insufficient for the payment of its obligations in full, and that up to the time of the institution of the suit the complainants had been, as a consequence of the custody and control of the bank commissioner, barred from withdrawal of any of their deposits, while under the provisions of the statute the depositors specified as exempted, but who in fact were entitled only to equal rights with the complainants, were to be allowed to withdraw the whole amounts of their deposits out of the funds available; that this would result in a deprivation of constitutional rights of the complainants, and should therefore be enjoined. The answer of the bank commissioner denied that the Baltimore Trust Company was insolvent, and stated that subsequently depositors generally had been permitted to withdraw as much as five per cent. of their deposits in this institution.

An objection applicable in this and all other suits by deferred depositors goes to their right to complain of any exemptions. It is urged that, so far as appears from the averments, they have suffered only a suspension or postponement of their rights as depositors, and that the exemptions allowed by the statute are no more than priorities or preferences in time or order of payment. The statute with which these controversies are concerned is not one providing for the winding up of banking institutions and distribution of their funds and assets according to the legal rights and priorities of claimants; such winding up and distribution is the subject of provisions in older sections of article 11 of the Code. See sections 9 and 61. The statute with which the court has to deal now provides for a moratorium for institutions still in business, but under restriction and protection. But, in so far as any of the depositors are preferred and exempted from the

protective restrictions, others are subjected to an inequality, in a probable greater delay from the reduction of resources on which the business of the depositors is to be built up and resumed, and a possibility of increase of loss in case of ultimate failure of the efforts to resume. And, in so far as this inequality may be a new imposition under the statute, it would materially impair the rights of deferred depositors under their contracts, and when the funds have been reduced it would in a measure appropriate their rights and interests in favor of the preferred and exempted. See *Edwards v. Kearzey,* 96 U. S. 595, 600, 24 L. Ed. 793. It is true that in legal theory money deposited in general deposits becomes the property of the banks, and the depositors become creditors (*Hardy v. Chesapeake Bank,* 51 Md. 562), but the depositors, as contributors to a common fund which each and all contract to have kept available for withdrawals, have in their right to resort to the fund *pari passu* a property right of value and importance, which must be as much within the protection of the Constitution of either the State or the Nation as any other property right; and, if the rights of some should be subordinated to allow full withdrawals by others, contrary to the bargain, there would be an impairment of the obligation of their contract, and a deprivation of their property without due process of law (Const. U. S., art. 1, sec. 10, and Fourteenth Amendment; Declaration of Rights of Maryland, art. 23); and except in so far, if at all, as the emergency should bring to bear a power overriding these constitutional prohibitions, the provisions would be invalid.

The constitutionality of the exemptions or preferences was contested below on several grounds not pressed on these appeals, and the court confines its attention to those pressed and necessary to the decisions; and, as the grounds differ in one appeal and another, they must be considered separately, with reference to the exemptions of deposits to which they apply. We take the exemptions up in their order in the statute and in the bill of complaint, although this is not the order in which the appeals have been entered.

### Exemption and Priority of Funds Deposited in the Name of the State.

On the question whether a valid exemption or priority for withdrawals of state deposits exists after the enactment of the emergency statute, the judges of this court are equally divided in opinion, and the court will order a reargument of that question.

### Priority for Deposits by Baltimore City.

The city appeals from the denial in the decree of the statutory exemption or priority for withdrawals of deposits by it as a "municipality" and "political subdivision" of the State, and also for withdrawals of the amounts of checks in possession of the city given in payment of taxes and specifically excepted by the terms of the statute. Section 71G. The city, as has been stated, could not share in the prerogative preference of the State at common law. *Frederick County Commrs. v. Page,* 163 Md. 619, 164 A. 182. Therefore, if the statutory preference for its deposits is valid, it is unquestionably new, and derived entirely from the statute; and, as it alters the relative rights of the complainants as depositors, impairs the obligations of their contracts, and deprives them of their property without due process of law, it must be invalid, except in so far as an emergency or police power should be found to prevail over the constitutional prohibitions, and to have been properly exercised in this instance.

The court has had the benefit of exhaustive study and argument with respect to governmental power in emergencies, both of that freedom of action which may be viewed as the natural or inevitable response to danger in catastrophies, as in destroying property to prevent spread of destruction from fire or other agencies, in causing injury or death in self-defence or in efforts at self-preservation, and otherwise (4 *Dillon, Mun. Corp.* [5th Ed.], sec. 1632; *Stone v. Mayor,* 25 Wend. [N. Y.] 173; *Aitkin v. Village of Wells River,* 70 Vt. 308, 40 A. 829; *American Print Works v. Lawrence,* 21 N. J. Law, 248; *Philadelphia v. Scott,* 81 Pa. 80; *Ran-*

*dolph, Eminent Domain,* secs. 8, 9), and also of the sovereign police power, which may override some of the express constitutional provisions upon occasion (2 *Cooley, Const.-Lim.* [8th Ed.] 1237; *Brown Holding Co. v. Feldman,* 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; *Yeatman v. Towers,* 126 Md. 513, 95 A. 158; *Ex parte Milligan,* 4 Wall. 2, 120, 18 L. Ed. 281; *Baring v. Dabney,* 19 Wall. 1, 22 L. Ed. 90). It might be difficult to say that the statute here intends to place the priority of city deposits on the ground of necessity in meeting emergencies, for only unsecured deposits are involved, and there is no indication in the record of the amount and importance of these; and the exemption or priority is extended by the terms of the statute, apparently without reference to emergency needs, alike to all municipalities, counties, towns, taxing districts, political subdivisions of the State, and any officers, boards, commissions, institutions, or other agencies thereof or receivers of banking institutions. The special exception for the city of amounts represented by checks of individual depositors paid to the city collector on or before February 28th, however, is expressly stated to have as its purpose the provision of necessary funds to meet certain bonded indebtedness maturing on March 1st, and to enable the city to provide emergency relief for which funds were otherwise not available. The supposition of the statute that there was need of this exception of checks has been denied in argument, it being represented that in point of fact there has been no default in meeting the city's obligations, and no falling off in emergency relief; but such contradicting facts are not before the court.

If the existence of the emergency and urgent need of immediately available funds for the city be conceded, and if it be conceded that there must be power in the General Assembly to provide some recourse for meeting the need, the recourse adopted is in effect that of commandeering *pro tanto,* without compensation, funds or rights of the complainants, and others of the small fraction of the citizens who happen to have their money in the same depositary which has the city

deposits, commandeering them, that is, both by the priority to be given the city deposits and by that to be given to withdrawals by taxpaying citizens in favor of the city, so far as their checks may have been drawn upon the one depositary. There is an inequality in favor of the drawers of these checks over others who had not drawn checks to pay their taxes before March 1st, and whose deposits were held subject to restrictions, but the grievance of the complainants would be confined to withdrawals from their depositary.

Even if it is true that the State may under a police or emergency power provide a municipality with needed funds by some method other than that of taxation, a contention on which no decision is necessary now, the exercise of that power must be none the less subject to the requirement of equal treatment of the citizens. "The constitutional guaranty entitles all persons and corporations within the jurisdiction of the state to the protection of equal laws, in this as in other departments of legislation. It does not prevent classifiation, but does require that classification shall be reasonable, not arbitrary, and that it shall rest upon distinctions having a fair and substantial relation to the object sought to be accomplished by the legislation." *Atchison, Topeka & S. F. R. Co. v. Vosburg,* 238 U. S. 56, 35 S. Ct. 675, 676, 59 L. Ed. 1119. The court has not been able to agree that this division of depositors into public and private, for the purposes of the emergency act, is based upon a reasonable and constitutional classification, for, assuming that the need of continuing supplies for the exercise of the governmental functions of the city must prevail over the interests of individuals, the only proper classification of individuals to be subordinated and burdened for the purpose would be one of all the citizens, and not one of the small part of them more quickly reached through a preference and priority over private bank deposits. It may be true that the processes necessary to raising money in other ways would have been dangerously slow, and that therefore some such resort as the one adopted was much to be desired on behalf of the city as a

whole, but, when the one adopted is referred to the courts to be tested by constitutional requirements, the individuals concerned are entitled to demand the security which those requirements are designed to afford them, notwithstanding the difficulties it may bring upon the government. If in pressing emergencies there is disadvantage in unyielding constitutional restraints, it is the price necessarily to be paid for the security sought in them.

For these reasons the court has concluded that bestowing upon the city a new exemption and priority in the deposits in the Baltimore Trust Company is a partial, unequal appropriation of rights and interests of deferred depositors that cannot be supported under the police power of the State or any emergency power, and must therefore be held invalid; and so much of the decree as is appealed from by the city in Case No. 15 must be affirmed.

### Priority for Deposits by Bank Commissioner as Receiver of Insolvent Bank.

The bank commissioner, in his capacity as receiver of the Chesapeake Bank of Baltimore, appointed under section 9 of article 11 of the Code, appeals from the denial in the decree of the validity of the statutory exemption from restriction of deposits by him as "the receiver of any banking institution." The inclusion of this priority in the statute is founded ultimately upon a theory that the bank commissioner so far represents the State in acting as receiver of a banking institution, that funds deposited by him are public funds entitled to the State's prerogative preference; and the court finds this theory untenable. The commissioner is undoubtedly a state officer, but, when he acts as receiver of the funds of a bank, he is a state officer serving in the place of an ordinary chancery receiver, in that he holds the funds for the ultimate purposes of the litigation exactly as does the receiver of any other private corporation. There is no change in ownership or nature of the funds when he is appointed receiver. Until distributed otherwise, they con-

tinue to be owned by the corporation; and the corporation may possible resume business with them. *Mylander v. Page,* 162 Md. 255, 259, 159 A. 770; *Gaither v. Stockbridge,* 67 Md. 222, 224, 9 A. 632, 10 A. 309; *Miller, Equity Procedure,* 718. And, if there is to be no resumption of the business, and the funds are to be distributed to depositors and debtors of the defunct institution, then they would seem still to be obviously private funds. There would be no sufficient reason in law or in fairness, so far as the court can see, for preferring depositors of the defunct bank to those in a bank in the custody of the commissioner under the present statute. An analogy seems to be furnished in the decisions that trustees or receivers in bankruptcy are not entitled to the prerogative preference of the national government, and that a debt due the Director General of Railroads during war control was not entitled to priority as a debt due to the United States. "A deposit in bank of privately owned money does not create a debt to the United States, though such deposit is made by and to the credit of a receiver or trustee of a bankrupt estate. The United States, having no beneficial interest in the moneys deposited, was not financially injured by a breach of the conditions of the bonds in question. * * * The deposits now in question created debts owing by the depository bank to the representatives of the several bankrupt estates, and the moneys deposited, less expenses of administration, belonged to the creditors of those estates, to whom they must ultimately be distributed, the United States not being entitled to receive any part of those moneys, and it would not have been financially harmed if no part thereof had been paid." *Florida Bank & Trust Co. v. Union Indemnity Co.* (C. C. A.), 55 Fed. (2nd), 640, 641; *Davis v. Pringle,* 268 U. S. 315, 45 S. Ct. 549, 69 L. Ed. 974; *Mellon v. Mich. Trust Co.,* 271 U. S. 236, 46 S. Ct. 511, 70 L. Ed. 924.

We concur with the court below in holding that the priority attempted in the statute is invalid because it is not a preference of State funds, and would violate the constitu-

tional prohibitions against impairing the obligations of the complainants' contracts and depriving them of property without due process of law, however the attempted priority for State funds may be regarded.

> *So much of the decree appealed from in Nos. 14 and 15 affirmed, with costs, and action as to matter of appeal in No. 16 reserved for reargument.*

_____

*On Reargument of No. 16.*

PARKE, J., delivered the opinion of the Court.

After reargument and further consideration, the court is of the opinion that when chapter 46 of the Acts of 1933 became effective there remained no priority, either at common law or by statute, in favor of the moneys of the State on deposit accounts in the banking institutions which are within the purview of this enactment. The circumstances and legal principles which guided and controlled this tribunal in reaching its conclusion will be fully stated because of the importance of the questions involved.

Although it is rejected in some jurisdictions, the general doctrine is that the State, on account of its prerogative right under the common law, has a priority over other creditors and depositors in the distribution of the assets of an insolvent bank, subject, however, to all the limitations of the common law, but this prerogative right of the State is not enjoyed by the county or other political subdivision of the State. *Michie on Banks and Banking,* vol. 3, sec. 170, pp. 231, 233; sec. 196, p. 278; *Frederick County v. Page,* 163 Md. 619, 637, 164 A. 182; *Glynn County v. Brunswick Terminal Co.,* 101 Ga. 244, 28 S. E. 604; *Bignell v. Cummins,* 60 Mont. 294, 222 P. 797. This priority, however, is not absolute but potential, and does not become effective until the State has duly asserted its claim by timely action. So, it has been determined that the preferential right of the State may be waived or lost, as

where a receiver or the bank commissioner takes charge of the insolvent bank (a), or a valid assignment for the benefit of creditors is executed, before the State takes steps to enforce its right of priority (b). It is, also, held that if the Legislature has adopted other means to secure the State's revenues, the common law does not apply (c).

(a) *National Surety Co. v. Pixton,* 60 Utah, 289, 208 P. 878; *State v. People's Savings Bank & Trust Co.,* 23 N. M. 282, 168 P. 526.   (b) *State v. Foster,* 5 Wyo. 199, 38 P. 926, 29 L. R. A. 226.   (c) *U. S. Fidelity & Guaranty Co. v. McFerson,* 78 Colo. 338, 241 P. 728; *In re Central Bank of Wilcox,* 23 Ariz. 574, 205 P. 915; *United States v. State Bank of North Carolina,* 6 Pet. 29, 8 L. Ed. 308; *National Surety Co. v. Morris,* 34 Wyo. 134, 241 P. 1063.

On the other hand, it has been held that the common law right of priority exists, unless it is denied by an express statutory provision; and that it is not affected by the fact that a receiver or the state superintendent of banks takes possession of the assets of an insolvent bank. *National Surety Co. v. Pixton,* 60 Utah, 289, 208 P. 878; *U. S. Fidelity & Guaranty Co. v. Bramwell,* 108 Or. 261, 217 P. 332; *American Bonding Co. v. Reynolds* (D. C.), 203 Fed. 356; *Ætna Accident & Liability Co. v. Miller,* 54 Mont. 377, 170 P. 760.

The absence of uniformity among the decisions of other jurisdictions renders it all the more important clearly to apprehend the doctrine as formulated and applied in Maryland. As at present advised, the first case relating to the question at bar that is found in the reports of this state is contained in the footnote (e) to *Jones v. Jones* (1828), 1 Bland, 443, at page 446. It is there stated that in the year 1713 equity entertained a bill of complaint which was filed by Maurice Birchfield, surveyor general of the Southern District of America, for and on behalf of the King against Joseph Brown, Margaret Brown, Richard Bennett, and Richard Smith, the representatives and debtors of Peregrine Brown late of London, merchant, to recover a debt due from the deceased to the Crown, on the theory that the King's debt was preferred. It should be noted, however, that Chancellor

Bland, after stating the cause, made the interesting observation that it and other similar cases, which might be adduced from the records, show that the Court of Chancery in Maryland, before the Revolution, was, in many instances, resorted to as a court of exchequer. See *State v. Bank of Maryland* (1834), 6 G. & J. 205, where a bill in equity was filed to enforce the preference of the State.

After the establishment of independence, it was early decided that the common law of England had been adopted by the third article of the Declaration of Rights of Maryland, so far as it was not inconsistent with the principles of that instrument and the nature of our political institutions. *State v. Buchanan,* 5 H. & J. 317, 358; *Dashiell v. Attorney General,* 5 H. & J. 392, 401. Consequently, in the cases of *State v. Rogers* (1786), 2 H. & McH. 198, and of *Murray v. Ridley's Administratrix* (1793), 3 H. & McH. 171, and of *Contee v. Chew's Executor* (1803), 1 H. & J. 417, the common law rule was enforced that the State had a preference to be first paid out of the estates of decedents, whenever no liens of other creditors intervened.

In the absence of any liens that had been acquired during the life of the debtor, his death determined the classes into which his creditors fall, and assured an equality among his unsecured creditors which was not disturbed except by the preference in payment accorded to the sovereign, if one among the unsecured class of creditors. *Supra.* So, the death of the debtor having fixed the status of the several creditors, the preference of the State was variously asserted, and her priority recognized. In the first case cited, it was by a writ of *scire facias* issued at the instance of the State. In the second case cited, the administratrix was sued on a writing obligatory of her intestate, and she pleaded by way of confession and avoidance that her intestate was indebted to the State as well as to the plaintiff and to other creditors in unsecured sums but in equal degree, and that the assets of the intestate coming into the hands of the administratrix were insufficient to pay the debts of such general creditors of her intestate. The Attorney General appeared on the

part of the State, and the cause was submitted by the State and by the parties in interest on an agreed statement of facts to obtain a determination of the preferences, if any, and the court on the case stated held the State entitled to a priority among the unsecured creditors in equal degree with it. Similarly, in the third case cited there was a preference given to a judgment held by the State over a judgment held by an individual, because the State and the person were creditors of the testator in equal degree. In this instance, the question arose on the pleadings. A creditor of the decedent issued a *scire facias* upon his judgment which had been obtained against the testator in his lifetime. The executor of the debtor pleaded a prior judgment of the State against his testator, and that he had no assets in his hands more than sufficient to pay the debt due to the State upon its judgment, and that the assets were liable to the exclusive payment and satisfaction of the debt due the State. The plaintiff's demurrer to the plea was overruled and judgment given for the defendant.

It will be observed that only in the first decision cited was the State proceeding directly to enforce its prerogative right of preference through any original process. In this instance the writ of *scire facias* was employed, but in the last two cases the personal representative of the decedent successfully interposed the defense of no assets, because of the State's right to a priority which would exhaust the estate coming into the personal representative's hands. So, in *Hollingsworth v. Pallen's Administratrix* (1793), 3 H. & McH. 125, on a case stated between a judgment creditor and the debtor's administratrix, it was held that an administratrix was not justified in her plea of *plene administravit* when it appeared that she had exhausted the personal estate of her intestate by payment of the State's debt in full, because, if a judgment be obtained against one in his lifetime, his executor or administrator is bound to satisfy it in preference to a debt or specialty passed to the State after such judgment. See *Davidson v. Clayland* (1805), 1 H. & J. 546, 549; *Jones v.*

*Jones* (1828), 1 Bland, 443, 446; *Hodges v. Mullikin* (1831), 1 Bland, 503, 515; *Ridgely v. Iglehart* (1832), 3 Bland, 540, 544.

In the appeal of *State v. Bank of Maryland* (1834), 6 G. & J. 205, the right of the State to preference was again presented and the law reviewed and declared. On that appeal the case was of an insolvent bank, which had made a general assignment of all its property to trustees for the equal benefit of all its creditors. After the trustees had converted the assets and had the funds in hand for distribution, the State of Maryland filed a bill on the equity side of the court against the bank and its trustees for the benefit of its creditors. It was alleged by the State that the treasurer of the Western Shore of Maryland had, on October 1st, 1832, in pursuance of a resolution of the General Assembly passed on March 14th, 1828 (No. 59), deposited of the public money of the State the sum of $50,089.96 in the bank at interest, payable on demand, and received therefor a certificate of deposit. The object of the bill was not to vacate the deeds of assignment to the trustees, but to subject the property and funds assigned to the payment of the entire debt due from the bank to the State, in preference to the other creditors, and to their exclusion, on the theory that the trustees took, and held, the fund subject to a preference in favor of the State. The court, speaking through Buchanan, C. J., declared: "The debt due from the bank to the State, is a debt on simple contract only, and not a lien, as is, and must be conceded. The State therefore having no lien on the property covered by the deed of trust, but a priority only, in the payment of its claim, if that right of priority has not been lost, it is subject, claiming under the common law, to the same common law rule, applicable to the royal prerogative right of priority in England, of the same description. That right in England is enforced by the process in the writ of extent in chief, or in aid, according to circumstances, and may be here, by proceedings known to our courts. But in either case, to make it available, the proceeding must be resorted

to, before other vested rights to the property sought to be subjected to the claim are acquired." Page 227 of 6 G. & J.

The decision of the court, therefore, was that the State's right of priority to the payment of its debt so long as the title to the property remained in the bank was defeated by the deed of trust. *Bank of Maryland v. Ruff* (1836), 7 G. & J. 448, 459, 460; *Smith v. State* (1847), 5 Gill, 45, 50 (claim of State filed after sale under creditor's bill); *In re Green's Estate* (1848), 4 Md. Ch. 349, 356 (claim of State filed after foreclosure sale); *State v. Baltimore* (1857), 10 Md. 504, 515, 516 (distribution in equity); *Orem, Executrix, v. Wrightson* (1879), 51 Md. 34, 42.

These illustrative decisions were followed, after a long interval, by the appeal of *State v. Williams* (1905), 101 Md. 529, 61 A. 297, where the claim of the State against an insolvent insurance company for loss on the State's property which was covered by the company's insurance, and for unearned premiums, was denied priority of payment from the receivers of the company as against the claims of other creditors, when the State had taken no proceedings to enforce her claim before the appointment of the receivers. To reach this conclusion the court decided that no distinction was to be made between the effect of a deed of assignment conveying the title of the debtor's property to a trustee for the equal benefit of all creditors, as in the case of *State v. Bank of Maryland*, 6 G. & J. 206, and the decree of court "passed upon a bill praying the dissolution of an insolvent corporation, in which cases the receivers appointed by a court under section 382 of article 23 of the Code of Public General Laws are vested with all the estate and assets of every kind belonging to such corporation from the time of their qualifying as receivers, and shall be trustees thereof for the benefit of the creditors of such corporation and its stockholders." Page 534 of 101 Md., 61 A. 297, 299.

Notwithstanding these decisions and their exposition of the principles upon which they were determined, the right of the State to a priority in payment of its deposits over those of other depositors who had deposits similarly made in a

bank in the possession of the bank commissioner of Maryland as receiver—whether by force of Code, art. 11, sec. 9, which authorized the receiver to take possession of such assets under circumstances named, or by force of section 61 of the same article, which authorized the board of directors of the institution to place its affairs and assets in the commissioner's hands—was asserted so lately as the case of *Public Indemnity Co. v. Page,* 161 Md. 239, 156 A. 791; but the State's right of priority was there held extinguished by such possession, as no proceedings to enforce the right had previously been taken by the State.

In the last mentioned appeal the court considered the argument advanced on the part of the State that the State's priority is enforceable so long as the debtor retains title to the property sought to be affected by the preference, and that a transfer of title did not take place in the case then at bar as it did under the deed of trust in *State v. Bank of Maryland,* 6 G. & J. 205, and by virtue of the statute under which the receiver was appointed in *State v. Williams,* 101 Md. 529, 61 A. 297. In the rejection of this contention this court, speaking through Judge Urner, said: "It does not appear, however, from the opinions in those cases that they depended upon a conclusion that the debtor corporations had completely parted with title to their property. It was because their assets had passed beyond the reach of any lien-creating process that the State's claims of priority were disallowed." The right of the State is "to have its debt first paid out of the property of its debtor remaining in his hands, and no lien standing in the way." This test barred the right of the State to priority in *State v. Bank of Maryland, supra,* in *State v. Williams, supra,* and in *Public Indemnity Co. v. Page, supra,* because, in the first case, the debtor had no property remaining in his hands, in consequence of a deed of assignment for the benefit of his creditors; because, in the second case, of a receivership for the benefit of creditors and a statutory dissolution of the corporate debtor; and because, in the third case, of a statutory receivership, which, as stated

at large in the opinion written by Judge Urner, transferred the possession of all the debtor's property to the bank commissioner as receiver, and thereby barred any and all attachments, liens, executions, or distraints of any kind. The receivership further contemplated an administration of the corporate affairs in chancery until the institution could, under prescribed conditions, resume business or be liquidated and its affairs wound up. As accurately observed by the court with respect to the last-named case: "When action has been duly taken in pursuance of those provisions, the right of the bank to dispose of its assets is divested as fully, for all practical purposes, as if it had executed a deed of trust for the benefit of its creditors. If the resumption of the business should become feasible, under conditions approved by the bank commissioner, the receivership could be discontinued. Otherwise its object is 'final liquidation,' and that could only be prevented by a demonstration of solvency which would wholly obviate such a question as the one now presented." Pages 246, 247 of 161 Md., 156 A. 791, 794.

In answer to the position that it is a general rule, in the interpretation of legislative acts, not to construe them to embrace the powers or prerogatives of sovereignty unless expressly named or included by necessary implication, the reply was that these provisions affecting the right of the State to priority of payment "must also be viewed in the light of other provisions of law reflecting upon the State's attitude in regard to its interests as a bank depositor." Page 247 of 161 Md., 156 A. 794; *State v. Milburn,* 9 Gill, 105, 108, 109; *State v. Balto. & O. R. Co.,* 34 Md. 344. The court then points to the requirement of the Constitution and of statute that deposits of state funds are to be conditioned upon the depositories giving security, satisfactory to the Governor of the State, for the safe-keeping and forthcoming of such deposits when required; to the creation of a department to supervise the control, and assure safe and sound conduct, of the affairs and operations of banks and trust companies created by the State and, in the case of either the dissolu-

tion of a trust company or of its insolvency, to the preference of all debts or liabilities due or owing by such corporation in any of the specified fiduciary capacities over all debts, liabilities of any nature whatsoever, including salaries and wages of employees and other preferred debts or liabilities. Const., art. 6, sec. 3; Code, art. 95, sec. 32; article 11, and especially sections 6, 46, 48. The court then concluded its opinion with this summation: "Under the established system of supervision of banking institutions which the State has incorporated, it has opportunity and ability to impose conditions tending to safeguard their solvency. In view of that authority, and of the separate and adequate security which is exacted for the State's deposits, and of the general policy revealed by the various provisions quoted, we are convinced that the Legislature did not intend to reserve, from the effect of the statutory receivership, the right to enforce the priority here invoked." Page 248 of 161 Md., 156 A. 794.

It is therefore clear that the right of the State to priority of payment over creditors, who, aside from the attribute of sovereignty, stand with the State *in equali jure,* is justiciable. The court has jurisdiction to inquire into the existence or extent of any alleged prerogative, it being a maxim of the common law that, *"Rex non debet esse sub homine sed sub Deo et lege, quia lex facit regem."* So the court will take cognizance of this primacy of the sovereign state, whatever the procedure, provided the right is manifest and the court has jurisdiction. *Elderton's Case* (1703), 2 Ld. Raym. 978 at 980; 6 *Halsbury's Laws of England* (2nd Ed.), secs. 511-513, pp. 443-446. Wherever the State holds a debt of equal degree with the debts of other creditors, she may assert, and obtain, her prerogative right to priority in payment, provided she has not lost this right of priority by vested rights in the property sought to be subjected to the claim having been previously acquired by other creditors either by the acquisition of a lien or title (a) ; or by the act of the debtor, as where the debtor has made an assignment of his

property for the benefit of his creditors (b); or by the transfer of the title and possession of the property of the debtor by operation of law, as in the creation of a statutory receivership for the liquidation of the affairs of an insolvent corporation and its dissolution as a corporation (c), or by the transfer by law of possession and control of the debtor's property to the State in the statutory receivership of a banking or trust corporation, or by some other form of waiver. *Public Indemnity Co. v. Page,* 161 Md. 239, 156 A. 791.

(a) *Hollingsworth v. Patten's Admx.,* 3 H. & McH. 125. (b) *State v. Bank of Maryland,* 6 G. & J. 205; *Bank of Maryland v. Ruff,* 7 G. & J. 448. (c) *State v. Williams,* 101 Md. 529, 61 A. 297.

With this statement of the principles and rules of law in mind, their application to the present record is apparent. The Emergency Banking Law, or chapter 46 of the Acts of the General Assembly of Maryland of 1933, is of universal application to all banking institutions and credit unions accepting deposits and doing business, and by its provisions simultaneously granted and conferred upon the bank commissioner the custody, control, and management of such institutions and unions within the confines of the state; and directed the commissioner to assume these functions on March 4th, 1933, when the statute became effective as emergency legislation. The act created seventeen new sections to article 11 of the Code, entitled "Banks and Trust Companies."

The complete possession, control, and management transferred by these sections were to continue for one year from the passage of the law, with a provision for an additional year, subject, however, to the privilege of a banking institution earlier becoming exempt from all the terms of the statute whenever the bank commissioner should deem it in the public interest and the Governor and Attorney General bestow their approval. During this period of possession, management, and control, (1) all of the remedies at law or in equity of any depositor, creditor, stockholder, or other person

in interest, arising out of agreements or transactions made prior to the passage of the act, against these banking institutions, together with the statute of limitations, are suspended; (2) the assets in the possession of the bank commissioner shall be deemed *in custodia legis,* and the property of the institutions shall not be subject to attachment, execution, distraint, or seizure under judicial process of any kind, (3) except with respect to new deposits and liabilities for transactions subsequent to the passage of the act, all rights to withdraw deposits from or assert claims against any banking institution are stayed, but the commissioner is authorized to restrict and prescribe the terms and conditions upon which deposits, funds, and assets of the bank may be withdrawn; (4) new deposits may be received which shall be withdrawable in accordance with the terms of the new deposits and be preferred in right of payment and satisfaction to all other deposits, debts, or liabilities of any nature whatsoever made or incurred prior to the assumption of management by the commissioner, and the percentage of old deposits when made available for withdrawal by the commissioner, from time to time, shall have the status of new deposits; (5) insolvent banking institutions may be reorganized as prescribed, with provision made for concluding the non-assenting parties in interest; and (6) the commissioner may exercise the powers conferred by section 9 of article 11 and, with the written consent of the Governor and Attorney General obtained prior thereto, forthwith proceed as receiver, subject to the provisions of the section, until such institution shall resume business or its affairs be finally liquidated. All the provisions of the enactment are drawn with the purpose of securing either the rehabilitation or the liquidation of the financial institutions within the provisions of the statute law on the subject.

The statement of these provisions of the Act of 1933, ch. 46, reveals their close analogy with those sections of article 11 of the Code that relate to the possession of the bank commissioner as a receiver under section 9 of article 11. In

fact, during their period of operation, the terms of the additional sections enacted by the Act of 1933 are, with respect to the possession, custody, and control of the commissioner, more comprehensive, absolute, and exclusive. Code, art. 11, secs. 9, 8. And, finally, the questions of priority here considered can only arise when the financial institution involved is insolvent, and section 71F, contemplating as well this obvious contingency as an inability of a banking institution promptly to reorganize, secures the continued possession and control of the commissioner by declaring section 9 of article 11 of the Code available for the purpose of revival or final liquidation of the financial corporation. Inasmuch as the terms of the Act of 1933 not only unmistakably exemplify, but in an aggravated and multiplied form, the particular provisions which controlled the decision of the court in *Public Indemnity Company v. Page,* 161 Md. 239, 156 A. 791, the claim of the State to priority of payment by reason of a sovereign's prerogative on the record at bar must be denied, unless that late decision shall now be overruled, or there be some conditions inherent in the pending appeal to render the opinion in *Public Indemnity Company v. Page, supra,* inapplicable.

It has been strongly urged that the common law prerogative of the State to a priority of payment as against those creditors of equal degree is not lost, but enforced, by these sections of chapter 46 of the Acts of 1933:

"71G. All deposits of public money not secured by the deposit of collateral or by a surety bond, guaranteeing the payment of such deposits when demanded, now in any banking institution, made by the State of Maryland, any county, municipality or town, taxing district, or any political subdivision of the State or of any officer, board, commission, institution or other agency thereof or the receiver of any banking institution, shall be entitled to priority and immediately transferred to a new deposit and thereafter subject to all rights as to new deposits set out in section 71E of this Act.

"71H.  No suspension of remedies or extension of time for payment and no other provision affecting deposits of, or obligations to the State or any political sub-division or agency thereof, which are secured by deposit of collateral or by a surety bond, shall be effective unless and until the depositor of such collateral or the surety shall have executed an agreement in writing in form and terms satisfactory to the official authorized to accept and/or approve depository bonds for the State, such sub-division or agency, as the case may be, providing that such suspension, extension and/or other provisions shall not release or impair the lien of such collateral or the obligation of such surety, and providing further that such lien or obligation shall be enforceable only on demand made after default occurring upon or after the extended date of such secured deposit or obligation, as fully as upon default at the time originally provided.  Upon the filing of such agreement by the surety all liability of such surety as to future deposits of the State, or any political sub-division or agency thereof, as the case may be, shall cease.

"Provided, further, that the holder of a surety bond guaranteeing deposits in any banking institution in this State, including, but not limited to, deposits or obligations due to the State or any poltical (political) sub-division or agency thereof, shall not demand of or be entitled to receive from the surety or sureties thereof, payment of such bond at a rate faster than the deposit guaranteed thereby shall be payable by such banking institution, but the holder of such surety bond shall be entitled to demand and receive from the surety the full amount remaining payable upon the deposit whenever, if at all, the Bank Commissioner shall take possession of the institution as receiver."  See chapter 255 of Acts of 1933, which amended the form of section 71H.

The wording and effect of these sections make clear that the subject-matter of the legislation is not the granting of a new remedy to enforce a subsisting right, but the creation of a new and substantive property right in the form of a priority, unknown to the common law and enforceable only under

the peculiar conditions which the enactment itself brought into existence. It remains to develop the grounds for these conclusions.

1. As a preliminary question, it is of primary importance to determine whether or not the circumstances that the debt of the State when secured as contemplated by the Constitution and statute, is within the doctrine of the priority of the State.

The majority of the decisions of this court dealing with the priority of the State were before the adoption of the Constitution of 1867, whose section 3 of article 6 was identical with the corresponding sections of the Constitutions of 1851 and 1864, except that the latest constitutional provision provided how the moneys should be kept. *Niles on Constitutional Law*, 422, 423, 462, 463. The earlier mandate was that the treasurer should receive and keep the moneys of the State and disburse these funds for the purposes of the State, according to law, upon warrants drawn by the comptroller, and on checks signed by him and not otherwise. The duty of keeping the moneys was defined in the Constitution of 1867 by the addition of specific terms, which are here italicized: "The Treasurer shall receive *the moneys of the State, and, until otherwise prescribed by law, deposit them, as soon as received, to the credit of the State, in such bank or banks as he may, from time to time, with the approval of the Governor, select (the said bank or banks giving security, satisfactory to the Governor, for the safe-keeping and forthcoming, when required, of said deposits*), and shall disburse the same for the purposes of the State, according to law" etc. The section then concludes with another new clause that the Legislature *"may prescribe, by Law, the manner in which the Treasurer shall receive and keep the moneys of the State."* Accordingly, section 32 of article 95 of the Code was passed, and adds nothing to the duties of the treasurer, because the wording of the statute is practically identical with that of the Constitution.

The change made by the Constitution of 1867 was, apparently, neither the cause nor the result of controversy, and

there is some evidence that its significance was not fully comprehended. *Proceedings of Maryland State Convention, 1867,* pp. 87, 233, 234, 569-574, 750; *Perlman on Constitution of 1867,* 94, 95, 217; *Constitution of Maryland, with Appendix and Index, by Edward Otis Hinkley* (1867), p. 132. The three decisions of *Orem v. Wrightson* (1879), 51 Md. 34, *State v. Williams* (1905), 101 Md. 529, 61 A. 297, and *Public Indemnity Co. v. Page* (1931), 161 Md. 239, 156 A. 791, are the cases since 1867 in which the priority of the State has been discussed. The first two of these three cases did not involve the construction of section 3 of article 6 of the Constitution of 1867, but the last decision was concerned with this section. The principal obligor was a depositary of state money, and the sureties on its bond to secure the deposit by the treasurer of the state money had paid to the State their obligation on the bond because of the depositary's default; and the sureties, by way of subrogation, claimed the benefit of a right of priority, which they asserted was inherent in the State, in the distribution of the depositary's assets among its creditors in the liquidation of the affairs of the insolvent depositary in equity. The sureties were denied relief, because the State's right of priority had been extinguished by her failure to begin appropriate proceedings to enforce this right before the debtor's property had been transferred to a statutory receiver. The doctrine of subrogation had no application where the creditor's right to priority had been extinguished, and the court so held, but to hold the right of the State to priority had been lost to the sureties by its extinction argues an existence precedent to the extinction, and clearly, therefore, the court recognized and held in *Public Indemnity Co. v. Page, supra,* that the right of priority at common law was not destroyed by the fact that the Constitution of 1867 had required that all deposits in banking institutions of the State's money by the treasurer be adequately secured to the satisfaction of the Governor. See note in 40 *Harvard Law Review,* 322.

Having concluded that debts to the State, whether unsecured or secured as contemplated by the Constitution and

statute, are the subject-matter for the application of the principle of the right of priority of the State at common law, the further problem is presented of what shall be the position of the court with reference to the status of the several banking institutions that are embraced by the terms of the Act of 1933, with respect to a present state of solvency or insolvency.

Chapter 46 of the Acts of 1933 was an emergency act growing out of a grave financial crisis, and, while it was designed primarily to provide a period of relief, rest, and recovery for financial institutions, and then a complete and prompt resumption of business by those of adequate financial strength, and a controlled and part resumption of business by those of impaired and inadequate resources pending a reorganization which would restore the soundness of their financial structure, it was implicit in the legislation that an institution which could not reorganize must liquidate its affairs, and that situation is anticipated and covered by section 71F of the act. So long, therefore, as an institution is being operated and controlled by the bank commissioner according to the requirements of the act, the court cannot assume it to possess a financial status which would permit the court to ignore the probability of the rights of the depositors being adjusted on the basis of an insolvency. The necessity for the inclusion of the status of an insolvency of the banking institution in the deliberation of the court is clear.

2. The record on which the pending three appeals are at bar is in a confused state so far as the pleadings relate to this question. The bill of complaint avers a state of insolvency which is admitted by the demurrers but denied in the answers. The causes, however, appear to have been submitted on the demurrers. Furthermore, the successive holidays proclaimed by the Governor began with February 24th, 1933, and ended with March 4th, 1933, when the statute now under review became effective. The Baltimore Trust Company has not resumed its normal operations, but was permitted on March 21st to open its door on a limited basis, whereby its depositors were credited with but five *per centum* of the

amount of their respective deposits, and new deposits were accepted.

While the solvency or insolvency of a particular banking institution, however commonplace the actual situation may be, is not a matter of which the court will take judicial cognizance, yet the circumstances stated make so evident the probability that the rights of the parties in interest will ultimately be determined, either in a reorganization and resumption of business by the trust company, or in a winding up of its affairs and a dissolution, upon the basis of a subsisting insolvency, that the court must consider this probability if it would function with an adequate perception and appreciation of the actual realities of this record. The problems now pressed upon the attention of the court would be relatively unimportant if the trust company were able to pay its depositors and meet its other obligations as they accrue due in the ordinary course, and according to the custom of those engaged in a similar banking or trust business. For these practical reasons, the court must not disregard pregnant indications and thereby sublimate the real issue, but bring its deliberations in contact with the substantial condition that the trust company was, when the emergency act was passed, unable to meet its financial and trust obligations in the usual course of its banking and trust business.

3.  The General Assembly of Maryland must be assumed to have enacted the statute of 1933 with reference to the subsisting state of the law and the prerogative rights of the State. The granting of a new remedy to enforce, but not materially to affect, a subsisting right, is within the competency of the legislative body; but what the General Assembly designed was not the passage of a procedural measure, but the creation of substantive rights in the State, unknown to the common law and limited to a definite period but retrospective in their effect, and impairing the obligations and rights of third parties in existence under contracts or trusts formed before the enactment. At common law the subject-matter was the debt or obligation to the State and not to any of the subordinate divisions of the State that have been formed for political

and administrative reasons and purposes. *Frederick County
v. Page,* 163 Md. 619, 164 A. 182. The sections under con-
sideration embrace, and place upon an equality of priority, all
deposits of public money "made by the State of Maryland,
any county, municipality or town, taxing district, or any
political sub-division of the State or of any officer, board,
commission, institution or other agency thereof or the re-
ceiver of any banking institution." Furthermore, at com-
mon law any debt or obligation of the debtor to the sovereign
in equal degree with other debts to other creditors, if there
were no intervening liens or rights, was accorded priority in
payment, and this was so whether the State held collateral
or pledge or a guaranty of the payment, because these cir-
cumstances did not affect the degree of the debt, since, under
the doctrine of marshaling of assets, collateral or pledge
would eventually inure to the benefit of all creditors of the
same degree, and since the guarantor who paid would be
subrogated to the demand of the State to the extent of the
guarantor's payment. *American Bonding Co. v. National
Mechanics' Bank,* 97 Md. 598, 55 A. 395. The statute, how-
ever, divides the debt to the State and to its various and
remote divisions and agents, accordingly as the several de-
posits of public money are secured or unsecured. If unse-
cured, the deposits are given unconditional priority; but, if
secured, "no suspension of remedies or extension of time for
payment and no other provision affecting deposits of, or
obligations to the State or any political sub-division or agency
thereof, * * * shall be effective unless and until the depositor
of such collateral or the surety shall have executed an agree-
ment in writing," providing that the suspension, extension,
or other provision shall not release or impair the lien of such
collateral or the obligation of such surety; and, also, that the
lien on collateral or the obligation of the surety shall be
enforceable only on demand made after default occurring
upon or after the extended date of such secured deposit or
obligation as fully as upon default at the time originally
provided. Again, the right of the sovereignty at common

law was the discharge of the debt by according priority of payment, but the right bestowed upon the State and its political divisions and administrative agencies is not of *payment,* but of the formation of a new relation of *creditor and debtor,* by carrying the amount of unsecured fund to a new deposit account in the banking institution, to be "thereafter subject to all rights as to new deposits set out in section 71E of this Act." The last-mentioned section specifies that the deposit so made "shall be withdrawable in accordance with the terms of such new deposits, and shall be preferred in right of payment and satisfaction to all other deposits, debts or liabilities of any nature whatsoever, made or incurred prior to the assumption of management by the Bank Commissioner."

On the record at bar the financial institution is a trust company, and the law under which it operated provided that "upon the dissolution of any such company by the Legislature, court or otherwise, or in case of its insolvency, all debts or liabilities due or owing by such corporation in any of said fiduciary capacities, shall be preferred in the distribution of the assets of such company to all debts or liabilities of any nature whatsoever, including salaries and wages of employees and other preferred debts or liabilities." Code, art. 11, sec. 48; *Public Indemnity Co. v. Page,* 161 Md. 239, 248, 156 A. 791. Again, under certain conditions, priority over general depositors is accorded to trust funds, as is illustrated in the case of *Frederick County v. Page,* 163 Md. 619, 164 A. 182, where a priority was enforced as against general deposits because the banking corporation was held a trustee *ex maleficio.* Furthermore, the priority of the State is not enforced against one who has acquired a vested right in the property sought to be subjected to the claim, as the lien of an antecedent equitable mortgage, of a factor, a wharfinger, a pledgee, an assignee, as the State can only take priority subject to such liabilities as the debtor has legally created. *State v. Bank of Maryland,* 6 G. & J. 228, 229; 45 *Johns Hopkins University Studies* (1927), 35, 36; *Cas-*

*berd v. Atty. Gen.,* 6 Price (Exch.), 411, 464, 146 Eng.
Rep. 850; *King v. Lee,* 6 Price (Exch.), 369, 378, 146 Eng.
Rep. 837; *Pawlett v. Atty. Gen.,* Hardres (Exch.), 465, 469,
145 Eng. Rep. 550; *King v. Humphrey,* M'Cle & Yo. 173,
148 Eng. Rep. 371.

The statute, however, repudiates these limitations of the
State's prerogative right of priority, and declares all de-
posits of public money, no matter what the rights or interests
of other creditors or *cestuis que trustent,* if made by the
State, any county, municipality or town, taxing district, or
any other political subdivision of the State, or any board,
officer, commission, institution, or other agency thereof or
the receiver of any banking institution, shall be entitled to
priority and immediately transferred to a new deposit and
be given all the rights of a new deposit. Sections 71G, 71E.
In the measure of the new preference in payment accorded
to the deposit of the State, the act diminishes the security
formerly assured to specified trust funds and fiducial lia-
bilities, and correspondingly increases the monetary liability
of all depositors other than the State.

The comparison need not be continued. It is clear that
the State's priority of payment at common law as a pre-
rogative of sovereignty is an entirely different priority from
that granted by the statute at bar; and that the General
Assembly was not engaged in providing another remedy or
method of enforcing a subsisting right of priority residing in
the State, but in an attempt to create and define new and
different substantive rights growing out of a statutory change
made in the relation of the parties in interest.

So, the priority attempted to be granted the State by the
terms of chapter 46 of the Acts of 1933 is not declaratory of
the State's priority of payment at common law, nor its en-
forcement by a statutory procedure, but a newly conceived
and ordained preference, which is materially different in
origin, in subject-matter, in the parties entitled to assert the
priority, in the preferences given, and in the payment of the
State's claim. It has been held in England that where by

statute the Crown is empowered to do what it might there-
tofore have done by virtue of its prerogative, it can no longer
act under the prerogative, but must act under and subject to
the conditions imposed by the statute. *Atty. Gen. v. De-
Keyser's Royal Hotel, Ltd.,* (1920) A. C. 508; 6 *Halsbury's
Laws of England* (2nd Ed.), secs. 511-513. In the instant
case, where the statute is designed to supersede the common
law priority by the grant of a preference of a wholly differ-
ent nature and effect, the State has thereby even more ex-,
pressly waived her prerogative as created and limited by the
common law. *Supra.* Whatever rights of priority the State
may now enjoy with reference to the banking and other in-
stitutions within the operation of chapter 46 of the Acts of
1933 must, therefore, depend on the validity of the prefer-
ences intended to be granted by this legislation.

4. The State cannot impair the obligation of a contract
by legislative enactment, and does so, within the meaning of
the constitutional prohibition, if the language of the statute
would, if valid, change the terms of the prior contract by im-
posing new conditions, or rescinding, existing ones, or releas-
ing or lessening any of the contractual undertakings or rights.
*Cooley on Constitutional Limitations* (8th Ed.), 554, 555,
580-585; *In re Fidelity State Bank,* 35 Idaho, 797, 209 P.
449, 31 A. L. R. 781, and note.

The involuntary reduction or precipitation of the affairs
of a banking institution to the control and domination of the
State by the Emergency Banking Act requires that the solu-
tion of the legal problems created shall be determined as of
the date when the act became effective to create this status.
The State may not waive its common law priority and alter
the relative contractual rights and liabilities and corporate
obligations of the banking institution which existed when the
status was created. Here the State simultaneously enlarged
its own rights and demands beyond their lawful extent, and
thus appropriated, without compensation, the property rights
of her subjects to the State's advantage.

The deposits of the State were made with the privilege in-
hering in the State to enforce the common law right of prior-

ity of the sovereign, and, so, were made subject to the preferences or priorities lawfully obtained or arising before the assertion of the State's prerogative right of priority in a class of creditors otherwise equal in right; and, conversely, the subject made his deposit with reference to this prerogative of the State as it existed when his deposits were made. *Supra;* and *Cooley's Constitutional Limitations* (8th Ed.), Vol. 1, pp. 582-585, 594-599; *Maryland Jockey Club v. State,* 106 Md. 413, 419, 67 A. 239; *Edwards v. Kearzey,* 96 U. S. 595, 600, 24 L. Ed. 793, 797; *Bank of Minden v. Clement,* 256 U. S. 126, 41 S. Ct. 408, 65 L. Ed. 857.

Thus the relative rights and liabilities arising among the subject or depositor, the depositary, and the State, in respect to the several deposits of subject and State, constituted a part of the contractual relation and obligations of the subject with the depositary, and the subject may not complain if the common law priority of the State should require a preference to be accorded the State in the payment of her deposit. *Edwards v. Kearzey, supra.*

A submission, therefore, to the State's common law right of priority was a condition or implied term of the subject's deposit, but what the subject and depositor had thus impliedly agreed to as a contractual obligation and liability is substantially and fundamentally different from the preferences attempted to be retrospectively imposed by chapter 46 of the Acts of 1933.

The exemption of one of a class of depositors from a common contractual risk increases by the degree of the discrimination the burden of the others of the class. The inequality occasioned by giving a priority of payment to one of a class of depositors is an impairment of the right to an equality of payment on the part of the deferred depositors of the class, and of those whose rights of priority or of property are impaired. So, the preference created for the benefit of the State by the act impairs the obligations of contracts and deprives depositors and *cestuis que trustent* of their property rights without due process of law and, therefore, is invalid. U. S. Const., art. 1, sec. 10, and Fourteenth Amendment, and

article 23 of the Declaration of Rights of Maryland. The relation of depositors or *cestuis que trustent* with the financial institution of deposit was contractual or fiducial, and the Legislature had no power prejudicially to affect the vested rights, liabilities, and demands of these valid and past transactions. The federal and state constitutions interpose insuperable obstacles to legislative impairment or destruction of these contractual rights and obligations arising in contract or by way of trust. *Endlich on Interpretation of Statutes,* sec. 273; *Sutherland on Statutory Construction,* sec. 471; *Cooley's Const. Lim.* (8th Ed.), p. 812; 3 *Michie on Banks and Banking,* ch. 6, sec. 1, p. 8; *Baring v. Dabney,* 19 Wall. 1, 22 L. Ed. 90; *Curran v. Arkansas,* 15 How. 304, 14 L. Ed. 705.

The decisions of this court in the other two appeals on this record are decisive that the State has no power on the facts in this record to create the new statutory preference as attempted by chapter 46 of the Acts of 1933.

For the reasons here stated at length, the decree from which the appeals have been taken in Nos. 14, 15, and 16 must be reversed to the extent the decree is in conflict with this opinion.

> *Decree in Nos. 14, 15 and 16 affirmed in part and reversed in part, and cause remanded for a decree in conformity with the opinion heretofore filed in Nos. 14 and 15 and this opinion in No. 16.*

BOND, C. J., filed a dissenting opinion as follows, in which URNER, J., concurred:

The attack on the legislative provision for exemption and priority of state deposits is grounded on constitutional requirements, and in this domain the law imposes on the court an attitude, or an inclination. What the state government in its lawmaking branch has duly decided and declared shall be done must be supported as law if the court can by adoption

of any reasonable view or theory fit it within the constitutional restrictions. "The judgment of the Legislature that such a regulation is proper and desirable should be respected and enforced by the courts if there is any rational theory upon which it can be supported." *Keiningham v. Blake,* 135 Md. 320, 322, 109 A. 65, 66. "It is a plain and undoubted rule of construction that acts of assembly will be held to be valid and constitutional, unless so manifestly in conflict with some provision of the Constitution of the State that no discretion is left to the courts but to decide otherwise." *McCurdy v. Jessop,* 126 Md. 318, 323, 95 A. 37, 38; *State v. Cumberland & P. R. Co.,* 40 Md. 22, 53. The law demands a defensive effort by the court. And it is my belief that by adherence to the course thus prescribed all objections now raised to this provision of the statute are met, and that even without opposition to the objections the court should reach the conclusion that the provision is valid.

The available definitions and descriptions of the common law priority of the State are brief, and rather fragmentary except in some recent studies. The result of all authorities on the subject appears to have been cast up in a study by *Prof. Judson A. Crane,* in 34 *West Virginia Law Quarterly,* 317. See also *Ram, Assets, Debts and Incumbrances,* 13-36 (vol. 8, Law Lib.). While it had an ancient origin during the feudal era, it was continued in the common law as an expedient to promote the public good. "It is founded," said Justice Story in *United States v. State Bank,* 6 Pet. 29, 35, 8 L. Ed. 308, "not so much upon any personal advantage to the sovereign, as upon motives of public policy, in order to secure an adequate revenue to sustain the public burdens, and discharge the public debts." "It is of the incidental prerogatives and belongs to the King, not as an individual, but *parens patriae,* and as universal trustee for the people. It is, in fact, a reservation or exception to the general course of law in favor of the public or for its good." *American Bonding Co. v. Reynolds* (D. C.), 203 Fed. 356, 357. Such, too, is the explanation by this court in *State v. Bank of*

310

*Maryland,* 6 G. & J. 205, 226, and in the other states—a large majority of all—in which the rule of priority obtains.

There is nothing obscure or complex about the rule; it hardly admits of complication. The priority was and is simply a relative position in respect to other creditors in appropriation of a debtor's assets; the State had first right when resorting to them. In the earlier common law there were methods, even other than that of execution after judgment, by which the assets could be resorted to and the prior right asserted before any distribution among creditors generally. That could be done by the writ of protection, or by an extent. 3 *Blackstone, Comm.,* 289 and 420; *Ram, Assets, Debts and Incumbrances,* 25. But those two proceedings were not preserved in Maryland practice, and ordinarily the priority could be asserted only on a distribution among creditors generally. *State v. Bank of Maryland,* 6 G. & J. 205, 226. In Maryland the old processes or new ones could be made available, by legislation if not by judicial action; but the assertion must be limited to the available remedies as they may be provided. The right or priority in appropriation is here a right subject "to the same common law rule, applicable to the royal prerogative right of priority in England, of the same description." *State v. Bank of Maryland, supra.*

The right of priority is against other creditors rather than against the debtor. It does not affect the character of the debt. Against the debtor the State stands in the position of an ordinary creditor, and unless its debt has been reduced to judgment, and the debtor has lands, the right of prior application does not interfere with his commerce in any of his assets, or with the acquisition of rights in other persons; the debt does not carry a lien, any more than would a like debt to a private creditor. And as freedom of commerce and of transfer of rights to others is not interfered with, so the assets may pass out of the reach of creditors, including the State. "The Crown under its process against its debtor cannot seize the property of another. * * * When the property

has passed from the debtor to another by contract, or a fair and *bona fide* transfer before the *teste* of the extent, or under a sale by a sheriff in virtue of a *fi. fa.*, the extent comes too late, and the priority of the King is lost; * * * and the Crown can only take the goods subject to such liabilities as the debtor has legally created." *Giles v. Grover*, 1 Clark & F. 72; *State v. Bank of Maryland, supra.* Passage of title to another for the benefit of creditors is included among the transfers that take the assets beyond appropriation by action of the creditors in which the State has priority. *State v. Bank of Maryland, supra; Public Indemnity Co. v. Page*, 161 Md. 239, 156 A. 791. From this rule came the only restriction on allowance of priority at common law; and it was no more than the ordinary limitation on accessibility to creditors of particular assets of the debtor. So long as any given assets were liable to appropriation by creditors, the State had priority in the appropriation; when the assets under the law had passed out of the reach of such resort by the creditors, then, and then only, the right of the State of prior appropriation of them was lost. Priority is not identified with any particular procedure or method of assertion. The procedure and methods of assertion discussed are, in fact, for enforcement of the debt against the debtor, and not for the exercise of the right of priority as against other creditors. Nor can it be said that the State's priority is dependent upon the time of assertion of it, unless it is meant that there is no priority when, by reason of passage of title or rights in the assets in question, there is no longer any right in the State to resort to them.

Such was the right of priority at common law, and such was the right of priority that this court, in *State v. Bank of Maryland, supra,* and subsequent cases, found to have formed part of the law of Maryland. I do not see that there has been any alteration in the state right, or detraction from it, by judicial decision or otherwise, at least so far as this case is concerned with the subject. And this case is concerned with only the one fact of its existence. The argument that

a change has resulted from the decision in the case of *Public Indemnity Co. v. Page, supra,* if tenable, seems to me beside the point here, and irrelevant, for the court is not dealing with receivership of an insolvent bank under either section 9 or section 61 of article 11 of the Code, and any change which might result from that decision would not fix the law for the present case. Sufficient for this case is the unaltered fact that priority at common law for state deposits existed up to the time of the enactment of the Emergency Banking Act (*Public Indemnity Co. v. Page, supra*); from that point the law now to control is given us in the emergency statute, which, so far as it goes, is an origin of law. That common law priority did exist up to the time of the passage of the act is true, I think, notwithstanding the series of bank holidays declared from day to day immediately preceding the act, for an extra holiday does not affect rights and relations any more than does a twenty-second of February or a fourth of July. All alike derive the same legal effect from the same source. Code, art. 13, secs. 9, 10, 17 and 104. And that effect is no more than to suspend activity temporarily, leaving all rights and relations as they were.

The emergency arrangement was, of course, a new, special legislative creation, and the meaning and legal effect of it are properly to be ascertained in only one place—in the statute itself. It is an act of the law-making power of the State, the power that shapes for the law any arrangement it creates, and its incidents, and the power that creates and amends for the law any practice or method. Thus it is determined for us in the enactment creating it, that this arrangement for dealing with the emergency is not one that affects state deposits—disregarding secured deposits not now in question. For, analyzing the arrangement, so much is laid down for us explicitly, and we are not permitted to build from the *custodia legis* enacted, or otherwise infer, that the arrangement does affect the state deposits. The *custodia legis* of the emergency, the suspension of remedies, and other incidents, whatever the conditions so termed might

be in other connections, are incidents that do not affect the freedom to withdraw state deposits because the Legislature has determined that they shall not be of that kind. According to familiar notions, this may be an altered form of *custodia legis,* or not a *custodia legis* at all; but it must remain such as the Legislature has created it, and cannot be given another character by judicial action to conform to previous significations of the words used. The legislative design, up to this point, at least, seems indisputable.

It is true that the excepting of state deposits in this emergency arrangement and placing them in a position to be drawn upon as required, while other depositors are deferred and subordinated, would impair the obligation of the contracts of the other depositors and subject them to the unequal burden, contrary to constitutional requirements, if those other depositors were not already in that position. And it is contended that the priority for state money is not a continuation of priority of the common law, but a new priority, over and above that allowed by the common law, and derived from the statute alone, and that as it is a new priority the incidental subordination of the other depositors is to be regarded as a new imposition, and as such open to the constitutional objection made, equally with the priority attempted to be given to deposits of Baltimore City funds. But the statute, in directing that state deposits be set apart for withdrawal as required, appropriates so much of the funds of the common debtor to the exclusion of other similar creditors, and this is the priority that the common law gives. If there might be two identities in such like relative position in any case, I do not see on what ground it can be said that priority under this statute is new, over and above priority already possessed, and without constitutional support from it. It seems to me clear that the statutory provision at least can be viewed as an extension or attempt to apply existing priority, and if this construction is possible, and is one that tends to support the constitutionality of the provision, then the court is bound to adopt it. "All reasonable presumptions

must be made in favor of the validity of the provision."
*Keiningham v. Blake,* 135 Md. 320, 322, 109 A. 65, 66.
It is "the duty of the Court to give such construction to
Legislative Acts as will not bring them into conflict with the
Constitution." *State v. Cumberland & P. R. Co.,* 40 Md. 22,
54; *Painter v. Mattfeldt,* 119 Md. 466, 472, 87 A. 413;
*Fletcher v. Peck,* 6 Cranch, 128, 3 L. Ed. 162; *Ogden v.
Saunders,* 12 Wheat. 270, 6 L. Ed. 606. While priority
under the statute is subjected to some restrictions for the
emergency, it is in no respect enlarged beyond the limits
of that already possessed, and it is hardly permissible, merely
because of the restrictions, to describe subsequent priority as
unrelated to existing priority. No more does it seem per-
missible to hold that priority subsequently is new and unre-
lated because the statute has attempted to extend it to deposits
by municipalities and other bodies and officers, for that at-
tempt is attributable with at least equal plausibility to an
intention to extend existing priority too far. Mistaken at-
tempts to extend unquestioned legislative power are not so un-
common that an inference of intention to exert some other
power must arise from them. Here, again, the court is
bound to adopt that one of the possible constructions that will
tend to support constitutionality. Indeed, any supposition
that the draftsmen of this provision may have ignored exist-
ing state priority as a basis for the act, and contemplated
resting priority on a new and unrelated basis, seems strained.

But if priority under the statute must be regarded as new
and distinct in any degree, the fact still does not support the
objection that it impairs the obligation of contracts of other
depositors or deprives them of existing rights. So long as
other depositors are continued in the same relative position,
or a better one, so long as no existing contract obligation or
property rights are the worse for the new priority, how can
it be said that those depositors have been subjected to an im-
pairment or deprivation? Starting with the possession of
priority by the State, at common law, the Legislature was
free to create and arrange as it might deem fit within the

limits of that priority already possessed. Violation of the Constitution could come only from a change of position and rights. A mere change in theoretical legal basis of the same situation would be something with which the Constitution would have no concern. Compare *Smith v. Kansas City Title & Trust Co.,* 255 U. S. 180, 210, 41 S. Ct. 243, 65 L. Ed. 577; *Hamilton v. Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 161, 40 S. Ct. 106, 64 L. Ed. 194.

As to the contention that priority under the statute is invalid, or extended beyond existing priority, because not asserted in a lawful, effective manner, or in time, the answer seems again to lie in the fact that we are dealing with an act that makes the law, and makes practice, superseding, so far as it goes, previous law and practice. That it does assert priority for state deposits seems to me beyond debate, for in so many words it provides that under the scheme constructed for the emergency there shall be freedom and priority for state deposits. Given the fact that the State possessed priority, it would hardly be questioned that the Legislature might provide new or old methods of prior appropriation of debtors' assets. It might restore the writ of protection, or the remedy by extent, or similar remedies, or it might provide new ones. Remedies are at the disposal of the Legislature, so long as it does not impair existing rights. *Bronsom v. Kinzie,* 1 How. 311, 11 L. Ed. 143; *Ballo. & O. R. Co. v. Maughlin,* 153 Md. 367, 377, 138 A. 334; *Cummings v. Wildman,* 116 Md. 307, 316, 81 A. 610; *Safe Deposit & Trust Co. v. Marburg,* 110 Md. 410, 72 A. 839; *Miners' & Merchants' Bank v. Snyder,* 100 Md. 57, 59 A. 707; *Turnpike Co. v. Startzman,* 86 Md. 363, 38 A. 777. If the Legislature declares that appropriation shall be made, or that it is made, by statute, that necessarily becomes a legal method so far as it will serve. For settlement of controversies which may arise in enforcement in particular instances, such as a controversy on the existence of the debt or ownership of the assets, some further proceeding would be needed; a mere statute would not serve; but there seems to be no legal obstacle to a general statutory provision that where there may

316

be found assets subject to appropriation, such as bank deposits, the State shall still have priority, and that is the nature and effect of the present provision. The deposits are not withdrawn from the depository for redeposit elsewhere, but placed in the same depository in a position for withdrawal as required, but there is no substantial difference between the two processes; by either the State takes priority. Priority to the fullest possible extent is not asserted; during the emergency only unsecured deposits are to be given the preference; but the right is one which can be asserted to any minor extent that the Legislature finds desirable without causing the abandonment or loss of the whole.

The contention that, if assertion by the statute was intended, the effort came too late, seems answered by the fact that the emergency arrangement, however it may be analyzed, did not come into being before the assertion of the right. Nothing occurred before the assertion to interfere with it, or to change the conditions under which the right could be asserted. By the creating statute, indeed, it was declared that the arrangement should come into effect only subject to priority in the State, and the statutory creation could not have an effect beyond the limits of its being.